UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | Criminal No. 12-11-ART-(1), (2), (3) |
| v. | ) ) ) | |
| RAY DOUGLAS STAPLETON, TINA STAPLETON, and STEPHEN C. ARNY, | ) ) ) | **MEMORANDUM OPINION & ORDER** |
| Defendants. | ) ) ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

The Stapletons allege that the government's case against them is a house of cards, built on a series of Fourth Amendment violations. They filed this motion to suppress hoping to bring the house of cards tumbling down. Because the defendants' arguments lack merit, their motion to suppress will be denied. It will be up to the jury to determine whether the government's evidence against the defendants stacks up.

**BACKGROUND**

Ray Stapleton and his wife, Tina, ran a pain clinic in Paintsville, through which they employed Dr. Emmanuel Acosta and Dr. Stephen Arny. R. 111 at 1 & n.1. The four are charged with conspiring to distribute oxycodone, hydrocodone, and Xanax, all controlled substances. R. 1 at 2–3. The Stapletons are also charged with maintaining the pain clinic for the purpose of distributing controlled substances, and Ray Stapleton is charged with possessing oxycodone, hydrocodone, and Xanax with intent to distribute. *Id.* at 3–4.

The road to those charges runs through a routine traffic checkpoint. Ray Stapleton entered a Kentucky State Police traffic checkpoint, where he encountered Deputy Sherriff Rodney Minnix. R. 111 at 4. Sherriff Minnix noticed that Stapleton was not wearing his seatbelt and that the car smelled strongly of alcohol. *Id.* He ordered Stapleton to pull off the road and directed Trooper Adam Hall to the car. *Id.* Hall conducted a field sobriety test, which indicated that Stapleton was impaired, and a breath test, which indicated the presence of alcohol. *Id.* at 5. Along with the tests, Trooper Hall noticed that Stapleton's pupils were constricted (a sign of narcotic use) and that Stapleton smelled like alcohol. *Id.* Trooper Hall asked Stapleton if he had any alcohol that evening, and Stapleton said that he had an alcoholic coffee creamer and a pain pill earlier. *Id.*

Trooper Hall arrested Stapleton for possession of an open container of alcohol in a vehicle, operation of a vehicle under the influence of alcohol and drugs, and other traffic-related offenses. *Id.* at 5–6. He read Stapleton his *Miranda* rights and asked if he could search the car. *Id.* at 6. Trooper Hall testified (and noted on Stapleton's citation) that Stapleton consented. *Id.* However, Stapleton denies giving Trooper Hall permission to search his car. *Id.* at 19–20.

Stapleton was placed in the police cruiser, and Trooper Hall and Trooper Jake Stinnett began to search the passenger compartment of his car. *Id.* at 6. The troopers immediately spotted a cup of dark liquid in the center cupholder that smelled like alcohol and a pill bottle protruding from the pocket of a pair of jeans in the passenger seat. *Id.* They extracted the bottle, which read "for hard times" and contained various pills. *Id.* at 7. They kept searching and found a bank bag filled with a large amount of cash in the passenger seat, a box filled

2

with wine coolers under the floorboard, and a large number of one dollar bills in the glove compartment. *Id.* They found over $300,000 in the passenger compartment. *Id.* at 9.

About ten minutes into the search, Tina Stapleton arrived and told Trooper Hall that she was Ray Stapleton's wife. *Id.* at 7. She asked if she could drive the car home, but the officers told her that they planned to tow it. *Id.*

After that, the officers turned to the back of the car. Trooper Hall brought in another officer and Detective Brian Lee, who had more experience with narcotics. *Id.* at 8. They found a large number of pills, pill bottles, two locked suitcases, and a safe in the back of the car. *Id.* It was late in the evening by that time, so they secured the evidence and impounded Stapleton's car.

Stapleton had been moved to a detention center at that point, so Detective Lee drove there to interview him. Detective Lee confirmed that Stapleton had been read his *Miranda* rights and questioned him. *Id.* at 9. Stapleton told Detective Lee that he had so much cash because he didn't believe in banks and that the pills were from his clinic and scheduled to be discarded. *Id.*

Based on the information from the search and the interview, the police obtained a warrant to search Stapleton's car. *Id.* The search turned up more pills, more cash, and a note by Stapleton warning an unknown reader to limit the number of patients at the clinic in advance of a potential DEA visit. *Id.* at 9–10. In total, the police found almost 7,000 pills and over $1,000,000 in the car. *Id.* at 10. The police then obtained a warrant to search the Stapletons' home. There, they found more prescription pills, over $27,000 in cash, and various business documents. *Id.*

The final search was of the Stapletons' clinic. An officer went to Stapleton and asked if the police could search the clinic and potentially take or copy the patient files. *Id.* at 37. Stapleton resisted because such a search or seizure of patient files would require closing the clinic during the search or while the files were gone. *Id.* at 38. He explained that he had to give patients thirty days notice before canceling an appointment. *Id.* The officer then suggested that the police would copy the records of patients who had upcoming appointments. *Id.* After that exchange, Stapleton agreed to the search. *Id.* at 39. The police then headed over to the clinic, and the Stapletons drove over in their own vehicle. *Id.* They unlocked the clinic for the police, and Stapleton signed a form consenting to a search of the clinic. *Id.* at 10, 39. The Stapletons were cooperative, helping the police copy some of the patient files. *Id.* at 39–40. Eventually, the police realized that there were too many files to copy. *Id.* at 40. So, the police boxed up the files for seizure. *Id.* at 10. About 600 patient records, the clinic's appointment book, blank prescriptions, and a patient sign-in sheet were seized. *Id.* at 10–11.

Ray Stapleton moved to suppress the evidence seized during each search: the initial car search, the search of the car pursuant to a warrant, the search of the home pursuant to a warrant, and the clinic search. R. 42; R. 92. Tina Stapleton joined his motion. R. 56; R. 78 at 2.[1]

The Court referred the motions to Magistrate Judge Edward B. Atkins. R. 17-1 at 9. Magistrate Judge Atkins held two evidentiary hearings and recommended that the Court deny

---

[1] Dr. Arny joined the Stapletons' motion to suppress with respect to the clinic search, R. 103, but did not object to the report and recommendation. By failing to object to the report and recommendation, he has waived the right to further review. *See Thomas v. Arn*, 474 U.S. 140, 145 (1985); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).

the motion to suppress.  R. 89; R. 104; R. 111.  The Stapletons objected, the United States

responded, and the report and recommendation is now ripe for consideration.  R. 113; R. 122.

## DISCUSSION

The Stapletons begin their objections by asking the Court to re-rule on their original

motions, which the Court will not do.   The Stapletons believe that "all the grounds set forth

in the[ir] motions should be reviewed by the Court."  R. 113 at 2.  A general objection to a

report and recommendation like this one is not permitted.  The purpose of a referral is to

narrow down the issues in contention for review by the Court, and general objections defeat

that purpose.   That is why parties must point to the specific portions of the report and

recommendation that they believe are incorrect.  *See Robert v. Tesson*, 507 F.3d 981, 994

(6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify

the issues of contention, does not suffice to preserve an issue for appeal . . . .").  So, the

Court will review only the specific arguments raised in the Stapletons' objections.

The Stapletons raise five basic objections to the report and recommendation.  First,

the police had no lawful basis to seize evidence found during the first search of Stapleton's

car.  *See* R. 113 at 4–6.  Second, the warrant for the second search of Stapleton's car was

impermissibly broad.  *See id.* at 7.  Third, the warrant for the search of the Stapletons' home

was not backed by probable cause.  *See id.* at 8–9.  Fourth, the police did not have

Stapleton's consent to seize medical records from the clinic.  *See id.* at 9–12.  And fifth, the

police violated the Health Insurance Portability and Accountability Act when they seized

patient records from the clinic.  *See id.* at 12–13.  None of these objections provide a basis

for overruling the report and recommendation.

A district court reviews the objected-to portions of a report and recommendation de novo. *See United States v. Raddatz*, 447 U.S. 667, 681–82 (1980).

## I.      The Initial Search and Seizure of Stapleton's Car Was Lawful.

The Stapletons' first objection is that the Magistrate Judge erred by not finding that the evidence seized during the first search of the car should be suppressed. R. 113 at 4–6. The evidence was validly seized at the end of two lawful searches, so the objection will be overruled.

The Magistrate Judge found that the initial search of the passenger compartment was justified under the search incident to arrest doctrine. R. 111 at 12–17. An officer may search a vehicle incident to arrest if "it is reasonable to believe evidence relevant to the offense of arrest might be found in the vehicle." *Arizona v. Gant*, 556 U.S. 332, 335 (2009). Stapleton was arrested for having an open container of alcohol, driving under the influence of drugs or alcohol, and failing to produce his insurance or vehicle registration documents (among other things). Stapleton told the officers that he had taken a pill and had an alcoholic coffee creamer, and the officers smelled alcohol coming from his car. Based on that information, the officers could reasonably believe that the car might contain other pills, perhaps allowing them to identify what Stapleton had consumed earlier. R. 111 at 16. They could also reasonably believe that the car might contain other containers of alcohol, since they could see a cup of dark liquid and could smell alcohol coming from the car.

The Stapletons object and appear to argue that the search of the passenger compartment was not a valid search incident to arrest because the police did not find evidence related to the driving under the influence charge. *See* R. 113 at 6. The relevant inquiry is whether a reasonable officer could think that a search "might" turn up evidence

related to the charged offenses, not whether the search actually led to such evidence. *Gant*, 556 U.S. at 335. There is no requirement that an officer must actually find evidence of a charged offense in order for his decision to search for that evidence to be reasonable.

The Magistrate Judge then found that the secondary search of the back of the car was justified by the automobile exception to the warrant requirement. R. 111 at 17–19. Under the automobile exception, an officer may search a vehicle without a warrant if he has "probable cause to believe the vehicle contains contraband or evidence of criminal activity." *United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012). Probable cause requires "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *Smith v. Thornburg*, 136 F.3d 1070, 1074 (6th Cir. 1998) (internal quotation marks and emphasis omitted).

The automobile exception applied because the initial passenger compartment search turned up evidence that gave the officers probable cause to search the back of the car. After the initial search, the officers knew the following facts: Stapleton had said that he was working at a clinic as a contractor, Stapleton had over $300,000 in cash in his car, and Stapleton had a bottle of assorted pills with no prescription label. *See* R. 111 at 5, 7, 23. That was more cash than Trooper Stinnett had seen in one place in his entire life. *Id.* at 18. The officers could reasonably conclude that the mislabeled bottle of assorted pills close to a large amount of cash pointed to a drug-related crime. R. 111 at 18–19. And they could also reasonably conclude that Stapleton's willingness to have those items in the passenger seat meant that he might have more of the same in the backseat or trunk. *See United States v. Mans*, 999 F.2d 966, 969 (6th Cir. 1993) (upholding the search of a trunk where an initial

7

search of the car incident to arrest turned up a marijuana cigarette and a large amount of cash).

The Stapletons argue that, even assuming the searches were both lawful, the evidence found during the searches must be suppressed because it was unlawfully seized. R. 113 at 4–6. The case law is not entirely clear on the standard governing seizures of evidence found during a warrantless search incident to arrest or pursuant to the automobile exception. That is because cases often do not often clearly distinguish the requirements for a search from the requirements for a seizure of evidence found during that search. Take, for example, *United States v. Stewart*, 315 F. App'x 554 (6th Cir. 2009). *Stewart* dealt with a vehicle search incident to arrest. The case states that the police "may seize both contraband and any instrumentalities, fruits, or evidence of a crime that they discover in the course of the search." *Id.* at 559. It implies that the standard for such a seizure is probable cause but does not state so outright. *Id.* (discussing the seizure in a section entitled "Probable Cause to Seize the Keys"). Despite the imprecision, the standard for a seizure that, as here, occurs after police properly search a car under the automobile exception is probable cause. *See United States v. Cunningham*, 12-3778, 2013 WL 1405207, at *3 (6th Cir. Apr. 9, 2013) ("And police may seize evidence of crime that is found during such an automobile search." (citing *United States v. Charles*, 138 F.3d 257, 264 (6th Cir. 1998)); *United States v. Littleton*, 15 F. App'x 189, 192 (6th Cir. 2001) (requiring an officer to have "probable cause for the search of defendant's vehicle in order to hold the evidence seized admissible").

The police had probable cause to believe that the evidence seized was evidence of a crime. After finishing the searches, the police seized what they had found—over $300,000

8

and a large amount of pills—and impounded the car. R. 113 at 4–6. The police clearly had reasonable grounds to believe that the cash and pills were evidence of a drug-related crime.

The Stapletons' two arguments to the contrary are unconvincing. The Stapletons invoke the plain view doctrine, which permits the police to seize any evidence that they find in plain view during a valid search if the evidence's "incriminating character is immediately apparent." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993); *see also United States v. Garcia*, 496 F.3d 495, 510–11 (6th Cir. 2007) (explaining that the "immediately apparent" requirement means that the searching officer must have probable cause to believe the item is incriminating when he sees the item). However, the relevant standard here is probable cause, not plain view. Even assuming the plain view doctrine applies, the Stapletons' arguments fail. First, they argue that the evidence was not immediately apparent because the police had to search for it. *See* R. 113 at 5. But the plain view doctrine's "immediately apparent" requirement applies to the criminal nature of the evidence, not the location of the evidence. Here, the police saw the evidence during the course of their lawful search of the car, recognized its incriminating character, and seized it. Second, the Stapletons argue that none of the evidence seized was contraband (illegal). R. 113 at 5, 6. But there is no requirement that evidence be contraband in order to be seized. Instead, the evidence must have an immediately apparent criminal character. Here, the criminal character of a large amount of pills and a large amount of cash was immediately apparent. *See United States v. Chandler*, 437 F. App'x 420, 428 (6th Cir. 2011) (collecting cases holding that the criminal character of a large amount of cash is immediately apparent where a drug-related offense is suspected). Even under the Stapletons' preferred doctrinal framework, the seizure of the large number of pills and large amount of cash from Stapleton's car was lawful.

The Stapletons raise two final, more general objections related to the first vehicle search. First, they argue that the Magistrate Judge should have made a finding on whether Stapleton consented to the search of his vehicle. R. 113 at 3. The Magistrate Judge did not rule on the consent issue because he found that the search was valid regardless of whether Stapleton consented. Stapleton does not cite any authority requiring a court to address all possible legal bases for a search when it finds that one doctrine supports the search. *Cf. Immigration & Naturalization Serv. v. Bagamasbad*, 429 U.S. 24, 25 (1976) ("As a general rule courts . . . are not required to make findings on issues the decision of which is unnecessary to the results they reach."). Second, the Stapletons object to the Magistrate Judge's recommendation that Tina Stapleton lacked standing to challenge the search of her husband's vehicle. R. 113 at 14–15. It is not necessary to resolve the question of Tina Stapleton's standing. Even if she has standing to challenge the first vehicle search, her challenge fails because the search was valid. R. 111 at 26.

The Magistrate Judge found that the police validly searched Stapleton's car and seized evidence found during those searches. The Stapletons' objections do not identify an error in the Magistrate Judge's analysis and will be overruled.

## II.    The Search of Ray Stapleton's Car Was Conducted Pursuant to a Valid Warrant

The Stapletons' second objection argues that the Magistrate Judge erred when he found that the evidence seized during the second car search did not need to be suppressed. R. 113 at 7.

Search warrants must be sufficiently particular. A search warrant must "particularly describ[e] the place to be searched, and the . . . things to be seized." U.S. Const. amend. IV. This particularity requirement ensures that the warrant contains "enough information to

guide and control the agent's judgment in selecting what to take." *United States v. Richards*, 659 F.3d 527, 537 (6th Cir. 2011) (internal quotation marks omitted). The requirement also prevents warrants that are "too broad in the sense that [they include] items that should not be seized." *Id.* (internal quotation marks omitted).

The Magistrate Judge found that the search warrant met the particularity requirement. R. 111 at 20–23. The police searched the locked luggage and safe in Stapleton's car pursuant to a warrant. R. 73-1. The warrant authorized a search for drugs, materials used to make drugs, records of illegal activity, vehicles used to convey drugs, weapons used to secure drugs, or items purchased with drug proceeds. *See id.* at 4. It expressly incorporated Detective Lee's affidavit, which stated that he wanted a warrant to search the locked luggage and safe for drugs, cash, and other drug-related items. *Id.* at 1, 4–5. For those reasons, the Magistrate Judge found that the warrant was sufficiently particular. R. 111 at 23.

The Stapletons argue that the warrant was too broad because it authorized a search for things that could not be found in the safe and luggage. For example, the warrant authorized a search for vehicles used to convey drugs, and it is impossible for a vehicle to be located in a suitcase or a safe. R. 113 at 7. This is a strange argument. To see why, consider the remedy for an overly broad warrant. The remedy is severance of the overly broad portion of the warrant and suppression of the evidence seized under that portion. *See Richards*, 659 F.3d at 537. Here, the Stapletons claim that the portion of the warrant authorizing the search and seizure of any vehicles in the luggage or safe is overbroad. Assume the Stapletons are correct. As they note, no evidence could have been (or was) seized pursuant to that portion of the warrant. So there was no constitutional error, and there is no need to suppress the evidence that was seized.

The Stapletons have not pointed to any evidence seized under the portions of the search warrant for the vehicle that they describe as overly broad. So, their motion to suppress the evidence seized during the second search of the car fails.

### III. Even If the Warrant To Search the Stapletons' Home Lacked Probable Cause, Suppression Is Not Warranted Because the Good Faith Exception Applies.

The Magistrate Judge made three findings with respect to the search of the Stapletons' home. First, the search warrant was backed by probable cause and sufficiently particular. R. 111 at 27–32. Second, the evidence taken from the Stapletons' home was validly seized pursuant to the warrant. *Id.* at 33–34. And third, even if the warrant was deficient, suppression was not appropriate because the good faith exception applied. *Id.* at 34–35.

The Stapletons objected only to the first finding, so they have conceded that the good faith exception applies. R. 113 at 8–9. That means that, even assuming the Stapletons are correct that the warrant was deficient, the evidence seized pursuant to that warrant may be admitted. The good-faith exception allows the admission of evidence that was "seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." *United States v. Leon*, 468 U.S. 897, 905 (1984) (internal quotation marks omitted). The exception exists because when an officer reasonably relies on a warrant that a court later deems invalid, the officer has not done anything wrong. Suppression has no deterrent effect in those cases. *Id.* at 918–21. There are exceptions to the good faith exception, but the Magistrate Judge explained that none were present in this case. R. 111 at 35. And, again, the Stapletons did not object to that portion of the Magistrate Judge's report and recommendation.

Because the Stapletons did not object to the Magistrate Judge's reasoning on the good faith exception, the exception applies and prevents suppression of the evidence seized from their home.

## IV.    Stapleton Consented to the Search and Seizure of the Patient Files.

The Stapletons' fourth objection argues that the Magistrate Judge erred when he found that Ray Stapleton consented to the search and seizure of patient files in his clinic.  R. 113 at 9–12.

In general, searches and seizures must be authorized by a warrant to avoid running afoul of the Fourth Amendment; however, consent-based searches and seizures are an exception.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).  The government bears the burden of demonstrating that a "consent was, in fact, freely and voluntarily given."  *Id.* Voluntariness is determined by an examination of "the totality of all the surrounding circumstances."  *Id.* at 226.   Relevant factors include:  the defendant's personal characteristics, whether the defendant understands his right to refuse consent, the length of the interaction with the police, the use of coercive tactics by the police, and the presence of any other more subtle forms of police coercion.  *See United States v. Cochrane*, 702 F.3d 334, 342 (6th Cir. 2012).

The Magistrate Judge examined the totality of the circumstances and found that Ray Stapleton consented to the search of the clinic and seizure of the patient files.  R. 111 at 37–43.  During the search of the Stapletons' home, two officers asked Stapleton if he would agree to let the officers go to the clinic, box up the patient files, copy or scan those files, and then return the files to the clinic in a few days.  *See id.* at 37–38.  As the Magistrate Judge noted, the tape of the exchange is a bit difficult to understand.  However, Stapleton clearly

replied, "I don't care." *See id.* at 38. He then explained to the officers that he had to give

patients notice before cancelling an appointment. *See id.* The officers explained that they

could copy the files of the patients who had appointments the next day so those appointments

would not be affected. *See id.* Stapleton eventually gave the officers the address of the

clinic and agreed to accompany them there. *See id.* at 39; *see also* R. 106, Track 5 at 4:00 to

4:20 ("If you would, uh, we'd like to go on up there and would like for you to take us over to

the clinic—" "That's fine." "—if you're down with it."). After Stapleton agreed, the officers

asked him to sign a consent form. The form was titled "Kentucky State Police Consent to

Search" and authorized a search of the clinic. R. 111 at 39. The form stated that Stapleton

had read the form, understood his right to refuse to consent, and agreed to give up that right.

*Id.* When having Stapleton sign the form, the officer explained that he trusted Stapleton to

keep his word. He said that the form was just in case Stapleton later said that he hadn't given

them permission. R. 106, Track 5 at 4:20 to 4:40. Stapleton signed the form, saying,

"You've been straight with me. I've been straight with you." *Id.*, Track 5 at 4:40 to 4:46.

Stapleton then asked if he needed a lawyer, and the officer replied, "Buddy, that's your

prerogative." *Id.*, Track 5 at 4:46 to 4:52. After that, the Stapletons rode to the clinic in their

own vehicle, arrived about fifteen minutes later, and unlocked the clinic for the officers. R.

111 at 39. Upon arrival, the Stapletons copied some of the patient files and officers copied

others. *See id.* at 39–40. Once the officers realized there were too many files to copy, they

asked the Stapletons if they could box up the files. *See id.* at 40. Stapleton responded that he

wanted to copy a few of the files. *See id.* The Stapletons did not ask the officers to stop, ask

the officers to leave, or tell the officers that they did not want them to continue searching or

boxing up the files. *See id.* Considering all of these circumstances, the Magistrate Judge

found that Stapleton had consented to the search and seizure of patient files from his clinic. *Id.*

The Stapletons imply that the officers coerced Stapleton into agreeing to the search, but they do not point to any evidence of coercion. *See* R. 113 at 9 (urging the Court to "listen to the enhanced audio recording" because the setting was "certainly . . . coercive"). The Stapletons do not develop this implication into an argument. The Court listened to the recording and found nothing out of the ordinary. The officers simply explained to Stapleton that they would probably end up searching his clinic at some point during the investigation. Given that, they presented him with a choice. Consent to a search now when we can work around your schedule, or deal with a search later that may disrupt your business. Stapleton went with the first choice. Nothing on the recording suggests a coercive, as opposed to cooperative, conversation.

The Stapletons' next objection focuses on the difference between a search and a seizure. They point to the signed consent form, which mentions only a search of the clinic and does not mention the seizure of patient files. R. 113 at 10–11 (citing *United States v. Tatman*, 397 F. App'x 152 (6th Cir. 2010)). The Stapletons argue that Ray Stapleton consented only to what was in the form—a search—and not a seizure as well. This argument, which borrows from the parol evidence rule in contract law, is clever but wrong. The scope of consent to a search or seizure turns on the "the totality of all the surrounding circumstances," not any one fact such as a consent form. *Schneckloth*, 412 U.S. at 226. The Stapletons know this, of course. After all, they just asked the Court to find that Stapleton was coerced into consenting to the search even though he signed a form, *see* R. 111 at 39, stating that he was not.

The totality of the circumstances demonstrates that Stapleton consented to both a search for and a seizure of the patient files. When obtaining Stapleton's verbal consent, the officer repeatedly stated that he wanted to be able to box up the patient files, copy them, and return them later. Right before Stapleton signed the form, the officer explained that the consent form simply memorialized their conversation. The Stapletons helped the officers copy files at the clinic. And when the officers asked if they could box up the files, the Stapletons did not say no. Instead, they said that they wanted to copy some files they wanted to have handy. Stapleton never told the officers to stop boxing up the files. Could the officers have easily prepared a consent form that referenced both a search and a seizure? Absolutely. Should the officers have done so? Probably. Does their failure to do so mean that Stapleton did not consent to the seizure of patient files from his clinic? No.

The Magistrate Judge correctly found that Stapleton consented to both a search for and seizure of the patient files in the clinic, so the search and seizure were reasonable. So, the patient files seized from the clinic do not need to be suppressed.

**V.    Even Assuming the Police Violated HIPPA by Seizing Patient Files, Those Files Can Be Introduced Against the Stapletons.**

The Stapletons' final objection is that patient files should be suppressed because they were seized in violation of the Health Insurance Portability and Accountability Act (HIPPA). R. 113 at 12–13.

Suppression is a remedy. Remedies do not exist in the ether. They exist in relation to the violation of a right. The Stapletons' argument fails because they have not pointed to the violation of a right that warrants the use of the suppression remedy.

16

HIPPA regulates the patient-medical provider relationship, not law enforcement.  The statute contains a set of rules for how covered entities, such as doctors, may use and disclose confidential patient information.  *See* 42 U.S.C. § 1320d-2.  In general, patients must be given notice and an opportunity to object before their information is disclosed.  One exception is for law enforcement purposes.  Covered entities may disclose patient records without giving the patients notice in response to a court order, grand jury subpoena, or other legal or administrative process.  *See* 45 C.F.R. § 164.512(f).  If a covered entity violates HIPPA, the patient cannot sue that entity.  Instead, the patient can file a complaint with his or her state attorney general or the Secretary of Health and Human Services, who get to decide whether to pursue the complaint.  *See* 42 U.S.C. § 1320d–5.  Put in plain terms, HIPPA regulates the entities that keep patient medical records in order to protect the confidentiality of patient information contained in those records.

Since HIPPA has nothing to say about law enforcement procedures, it is no surprise that the Stapletons have not shown that the police violated HIPPA.  They point to the law enforcement exceptions and argue that the police should have obtained a court order before seeking the patient files.  R. 113 at 13.  However, the regulations establishing the law enforcement exceptions govern disclosure by covered entities, not seizure by law enforcement.  In other words, HIPPA places the burden on covered entities to say no to law enforcement.[2]  Nothing in the statute places an affirmative burden on law enforcement to go through the courts before searching or seizing patient records.  The police searched and

___

[2] The Stapletons originally argued that Stapleton invoked HIPPA during the conversation where officers sought his consent to search and seize patient files. R. 92 at 3. The Magistrate Judge found, based on the recordings and Stapleton's testimony, that Stapleton's concern was giving patients notice of cancelled appointments. R. 111 at 46. The Magistrate Judge specifically found that Stapleton did not invoke HIPPA, and the Stapletons did not object to that portion of the report and recommendation. For good reason. The Magistrate Judge's finding is amply supported by the record.

seized the patient files with Stapleton's consent.  Perhaps the Stapletons mean to argue that Stapleton violated HIPPA when he gave his consent.  If so, that shines a spotlight on the next problem with the Stapletons' suppression argument.

If a HIPPA violation occurred, the injured parties are the patients, not the Stapletons. As explained, HIPPA is aimed at protecting patient rights.  Suppression would benefit the Stapletons, not the patients.  So there is no reason why it is an appropriate remedy for any violation of the patients' HIPPA rights.  The error in the Stapletons' argument is even more obvious if the Stapletons are claiming that the relevant HIPPA violation occurred when Stapleton consented to the search.  In that case, the remedy of suppression would benefit the very person who violated the patients' HIPPA rights.

What's more, even if HIPPA was violated, suppression is generally aimed at remedying constitutional, not statutory, violations.  "As a general matter, where a statute does not specifically provide for the exclusion of evidence in the event of a violation, federal courts disfavor exclusion as a judicially-fashioned remedy."  *United States v. Young*, 533 F.3d 453, 461 (6th Cir. 2008).  For a statutory violation to serve as the basis for the suppression of evidence, "the statutory violation [must] implicate[] underlying constitutional rights."  *United States v. Abdi*, 463 F.3d 547, 556 (6th Cir. 2006).  That is because, as explained above, the purpose of suppression is to deter constitutional violations.  Without a constitutional violation, there is no deterrent benefit to suppression based on a statutory violation.  *See United States v. Ware*, 161 F.3d 414, 424 (6th Cir. 1998) ("Statutory violations, absent any underlying constitutional violations or rights, are generally insufficient to justify imposition of the exclusionary rule.").

Even assuming a HIPPA violation, there is no corresponding violation of a constitutionally protected right. The Magistrate Judge analyzed whether the alleged HIPPA violation might have violated the patients' right to privacy—the only plausible constitutional right in play here. He found that the seizure of the patients' medical records did not violate their constitutional right to privacy. R. 111 at 44–46; *see also Walker v. Wilson*, 67 F. App'x 854, 856–57 (6th Cir. 2003) ("This circuit has likewise concluded . . . that disclosure of medical records does not violate constitutional rights." (citing *Jarvis v. Wellman*, 52 F.3d 125, 126 (6th Cir. 1995)). The Stapletons did not object to this portion of the report and recommendation. So, they have conceded that there is no underlying constitutional violation that could trigger the suppression remedy.[3]

For all these reasons, the Magistrate Judge correctly found that HIPPA does not support the suppression of the patient files seized from the Stapletons' clinic.

---

[3] The Stapletons also argue that the patient files should be suppressed because the police violated Ky. Rev. Stat. § 311.595. R. 113 at 13. That statute allows a licensing board to suspend, revoke, or limit a physician's license if the physician discloses confidential patient information. Even assuming the statute somehow applied to the police, that violation would not be relevant for Fourth Amendment purposes. "That is because the exclusionary rule emanates from the Fourth Amendment, not state law. While the states are free to impose rules for searches and seizures that are more restrictive than the Fourth Amendment, those rules will not be enforced in a federal criminal proceeding." *United States v. Beals*, 698 F.3d 248, 263 (6th Cir. 2012) (internal alterations and citations omitted).

## CONCLUSION

Accordingly, it is **ORDERED** that the Court **OVERRULES** the defendants' objections, R. 113, and **ADOPTS** Magistrate Judge Edward B. Atkins's Report and Recommendation, R. 111, denying the defendants' motion to suppress, R. 42.

This the 30th day of July, 2013.

Signed By:

_Amul R. Thapar_ AT

United States District Judge