**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**SOUTHERN DIVISION**
**PIKEVILLE**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | **No. 7:12-CR-11-03-ART** |
| **PLAINTIFF** | ) | |
| | ) | *Electronically Filed* |
| **V.** | ) | |
| | ) | |
| **STEPHEN C. ARNY,** *et al.,* | ) | |
| | ) | |
| **DEFENDANTS** | ) | |
| | ) | |

<u>**MEMORANDUM IN SUPPORT OF**</u>
<u>**DEFENDANT'S MOTION FOR NEW TRIAL**</u>

Kent Wicker
Nicole S. Elver
Lesley Bilby
DRESSMAN BENZINGER LAVELLE PSC
321 W. Main St., Suite 2100
Louisville, Kentucky 40202
Telephone: (502) 572-2500
Facsimile: (502) 572-2503
E-Mail:  kwicker@dbllaw.com

*Counsel for Dr. Stephen Arny*

Table of Contents

Introduction ………………………………………………………………………………... 1

Facts …………………………………………..……………………………… 2

I.      Background …………………………………..…………………………..... 2

II.     Trial …………………………………………………………..… 4

        A.      Dr. Arny's Counsel Did Not File A *Daubert* Motion. …………………… 5

        B.      Dr. Arny's Counsel Failed To Interview His
                Predecessor, Dr. Saxman  ………………………………………… 6

        C.      Dr. Arny's Counsel Failed To File Any Motions *In Limine* . …………... 7

Law and Argument ………………………………………………………... 9

I.      Dr. Arny's Counsel Did Not File A *Daubert* Motion. ……………………… 13

II.     Dr. Arny's Counsel Failed To Interview His
        Predecessor, Dr. Saxman  ………………………………………… 16

III.    Dr. Arny's Counsel Failed To File Any Motions *In Limine* . ………………… 17

        A.      The KBML Investigation ………………………………….............. 18

        B.      The Testimony of Keisha Wright ………………………………… 19

        C.      Dr. Arny's Finances ………………………………………… 20

        D.      The Alleged Characteristics of Dr. Arny's Patients. …………………... 21

Conclusion ………………………………………………………… 21

Defendant, Dr. Stephen Arny ("Dr. Arny"), by counsel, respectfully submits this Memorandum in Support of his Motion for New Trial ("Motion").  As the basis for his Motion, Dr. Arny states that the legal representation he received during his trial was inadequate and the interest of justice requires a new trial because his trial failed to produce a just result.

## INTRODUCTION

Dr. Arny makes this Motion based on the opinion issued by Judge Boggs in *U.S. v. Munoz*, 605 F.3d 359 (2010).  In that opinion, Judge Boggs presented a legal question as to whether a court may grant a defendant a new trial based on "lackluster" representation that does not fall below the constitutional standard, which he referred to as "ineffective assistance light." In presenting this question, Judge Boggs conducted a thorough analysis as to why this ineffective assistance light theory is a viable one.  However, in light of the fact that the district court based its reasoning for granting a new trial on the traditional *Strickland* analysis, as did the parties, he left resolution of that question for another day.

The matter presently before the Court falls squarely within Judge Boggs's ineffective assistance light standard.  Dr. Arny, a retired Army Lt. Colonel, worked as a physician in pain management for Paintsville Auto Accident Healthcare, Inc. ("PAAH") on two separate occasions, for a total of approximately eleven months.  Dr. Arny was charged with three counts of conspiracy to distribute and unlawfully dispense Schedule II, Schedule III, and Schedule IV controlled substances.  Throughout the course of the investigation and trial, Dr. Arny's legal representation was clearly substandard.  For example, Dr. Arny's counsel failed to file a *Daubert* motion to limit the testimony of one of the government's expert witnesses, and did not even show up for the hearing.  The Court entered an order limiting the expert witness's testimony based on a *Daubert* motion filed by the co-defendants; however, Dr. Arny's counsel failed to

enforce it.  Moreover, Dr. Arny's counsel failed to call Dr. Arny's predecessor at PAAH as a witness at trial or even to interview her, although she was responsible for establishing the pain management plans for many of Dr. Arny's patients, which he continued.  His counsel then lied to Dr. Arny about the reason he had not called her to testify.  Dr. Arny's counsel further failed to file any motions *in limine* to exclude certain evidence that was not relevant to the charges against him and highly prejudicial.  This combination of his counsel's failures rendered his representation woefully deficient and unquestionably prejudiced him.  Ultimately, Dr. Arny was convicted on all three counts, and currently awaits sentencing.

The language of Rule 33 allows for a court to grant a new trial "if the interest of justice so requires."  In the *Munoz* opinion, Judge Boggs suggested that it is appropriate to expand this phrase to include cases such as Dr. Arny's.  Specifically, Rule 33 should be interpreted to include such cases where the Defendant's representation may not have been so deficient to render it a Constitutional violation, but where it was so substandard that it prejudiced the Defendant.  For the reasons that follow, this Court should grant Dr. Arny a new trial.

## FACTS

### I.  BACKGROUND

Dr. Arny had a distinguished thirty year military career serving in both non-medical and medical roles.  Upon his departure from the military, he worked as a pathologist in various private medical facilities, only to return to the military as a pathologist in a military hospital. (DN 308, Testimony of Stephen C. Arny, at 8:17-12:3 (hereinafter "Arny Test., at _").)  Dr. Arny retired in his early 60s in Shelbyville, Kentucky.  *Id.* at 12:7-13:2.  However, after a series of unfortunate familial issues arose, Dr. Arny decided to return to work for financial reasons.  *Id.* at 13:13-22.  Dr. Arny contacted a recruiter to assist in his employment search.  *Id.* 13:23-14:7.

He was not able to find any temporary pathology positions in the area, so he began looking for other areas of practice for which he would be qualified. *Id.*

Dr. Arny received a call from PAAH, in Auxier, Kentucky. *Id.* He met with Doug and Tina Stapleton, the owners of PAAH. *Id.* at 14:13-14. They informed him that they needed someone to cover for a short period of time until they got a doctor that was Board certified in pain management. *Id.* at 14:17-15:2. Dr. Arny initially did not believe he would be a good fit. *Id.* However, after speaking with a pain management doctor, he felt his experience was applicable. *Id.* Dr. Arny began working for PAAH in August 2010. *Id.* at 45:14-16.

Dr. Arny inherited the patients at PAAH from Dr. Doina Saxman. *Id.* at 16:15-16. Dr. Saxman was the primary physician at PAAH from approximately March 2009 to March 2010. (DN 305, Trial Day 2, at 29:13-21; 71:8-11 (hereinafter "Trial Day 2, at _.").) When Dr. Arny took over for Dr. Saxman in August 2010, he admittedly did not have experience in pain management. (Exhibit 1, Declaration of Dr. Stephen Arny, ¶2, (hereinafter "Arny Dec. at ¶_.").) As such, he followed the medical care plan Dr. Saxman established for her patients. (Arny Test., at 20:13-21:7.) Based upon the potential risks associated with the combination therapy put in place for many patients by Dr. Saxman, Dr. Arny began to taper his patients off the medications. *Id.* Some patients were so upset by the reduction in their medication doses that they sought care elsewhere, including driving to Lexington to continue to see Dr. Saxman. (Arny Dec. at ¶4.)

After approximately a month, Dr. Arny decided he was not a good fit at PAAH, and could not care for the patients in a way that he felt was in their best interests. (Arny Test., at 16:5-9.) Consequently, he provided 90-days' notice to the Stapletons. *Id.* However, after he left, the Stapletons approached him and encouraged him to return until they could find a

permanent replacement. *Id.* at 17:19-18:10. The Stapletons had promised to make certain changes to allow Dr. Arny to better serve his patients. *Id.*

Upon his return to PAAH, Dr. Arny implemented several changes for the benefit of his patients. For example, he created a new clinic visit form for each visit and a summary of all the pertinent medical facts pulled out of the patient's chart, so he could find the information he needed quickly. *Id.* at 21:8-22:23.

In early 2011, Dr. Arny became aware that the DEA was investigating PAAH as well as the Kentucky Board of Medical Licensure. *Id.* at 24:8-25:19. Dr. Arny had expected to only be at PAAH for an additional month or two, but due to the investigations, remained for a longer period of time. *Id.* Dr. Arny retired from PAAH in November 2011.

## II.   TRIAL

On August 2, 2012, the government filed an indictment charging four defendants, Ray Douglas Stapleton, Tina Marie Stapleton, Dr. Arny, and Dr. Emmanuel Galang Acosta, Dr. Arny's successor, for violating 21 U.S.C. §846 by conspiring to distribute and unlawfully dispense Schedule II, Schedule III, and Schedule IV controlled substances in violation of 21 U.S.C. §841(a)(1). (DN 1, Indictment.) A warrant was issued for Dr. Arny's arrest on August 3, 2012. On August 17, 2012, Dr. Arny was arraigned and attorney Wesley K. Varney was appointed to represent him at that time. (DN 16, Minute Entry for Initial Appearance and Arraignment.) Immediately thereafter, Dr. Arny retained Stephen W. Owens and Mr. Varney (together "counsel") to represent him. *Id.* Dr. Arny pleaded not guilty to Counts I through III. *Id.* Dr. Arny was released and ordered to appear in the Eastern District of Kentucky, Pikeville for trial. *Id.* Dr. Arny's trial lasted for three days, from September 15 to 17, 2014. On

September 17, 2014, Dr. Arny was found guilty on all three counts alleged against him.  (DN 282, Verdict.)

Extremely dissatisfied with his counsel, Dr. Arny sought to retain new counsel to handle his sentencing and appeal, if appropriate.  On December 29, 2014, Dr. Arny's new counsel entered their appearance.  (DN 319, Notice of Appearance.)  On December 30, 2014, the Court relieved Attorneys Owens and Varney.  (DN 320, Motion to Withdraw.)   After meeting with Dr. Arny and reviewing the record, new counsel discovered that Mr. Owens and Mr. Varney failed to appropriately manage Dr. Arny's defense for numerous reasons, including failing to file a *Daubert* motion, failing to interview Dr. Arny's predecessor, and failing to file any motions *in limine*.

### A.     Dr. Arny's Counsel Did Not File A *Daubert* Motion.

The government offered Detective Randy Hunter as an expert witness regarding "pill mills" and claimed the basis for his experience was the investigation of numerous pill mill operations.  (DN 159, Transcript of August 5, 2013 *Daubert* Hearing, at 15:24-16:17 (hereinafter "Aug. 5 Hearing Trans., at _").)  Both the Stapletons and Dr. Acosta filed a *Daubert* motion to exclude Det. Hunter.  (DN 127 and 133.)  Dr. Arny's co-defendants objected to Det. Hunter's opinions arguing they were based on speculation, hearsay, and medical opinions he was not qualified to render.  *Id.*

A hearing on defendants' motions was held on August 5, 2013, during which Det. Hunter testified as to his "expert" opinion.  Many of Det. Hunter's opinions were directed not only at the characteristics of pill mills, but also the characteristics of PAAH and how it fit the characteristics of a pill mill.  (Aug. 5 Hearing Trans., at 5:21-6:24.)  Despite the detrimental nature of Det. Hunter's opinions to Dr. Arny, Dr. Arny's counsel did not file a *Daubert* motion, and in fact, did

5

not even bother to appear at the August 5, 2013 *Daubert* hearing.  (DN 160, Minutes of Daubert Hearing.)

At the conclusion of the August 5, 2013 hearing, the Court allowed all parties, including Dr. Arny, to submit additional briefing regarding Det. Hunter's opinions based upon the August 5, 2013 hearing.  (Aug. 5 Hearing Trans., at 111:13-15.)   However, again, Dr. Arny's counsel did not file any pleadings regarding Det. Hunter.  Ultimately, the Court issued an order limiting Det. Hunter's opinion, stating it would be prejudicial to allow him to opine on whether PAAH exhibited any of the features of a pill mill, and why any features of PAAH are inconsistent with legitimate medical treatment.  (DN 182, Memorandum Opinion and Order, at 3-4 (hereinafter "*Daubert* Order, at _.").)  Nevertheless, Det. Hunter did testify regarding specific characteristics of PAAH and how they are consistent with the characteristics of a pill mill without objection from Dr. Arny's counsel.  (DN 306, Trial Day 3, at 42:10-56:16 (hereinafter "Trial Day 3, at _.").)  By the very language of the Court's Order, such testimony was prejudicial to Dr. Arny.

**B.     Dr. Arny's Counsel Failed To Interview His Predecessor, Dr. Saxman.**

Neither Mr. Owens nor Mr. Varney bothered to interview Dr. Saxman to determine whether she would be a helpful witness to Dr. Arny.  As the Court well knows, Dr. Saxman was the primary physician at PAAH from approximately March 2009 to March 2010.  Dr. Saxman provided medical services to a stable panel of patients without serious complications, adverse events, or complaints.  She prescribed medications based on her medical judgment, and adjusted medications depending upon how the patients responded.

Dr. Arny took over for Dr. Saxman in August 2010.  (Arny Test., at 45:14-16.)  Dr. Arny reviewed Dr. Saxman's records for her patients and continued the medical care plan she put in place for them, making adjustments in medication when necessary.  *Id.* at 20:13-21:7.  In fact,

during Dr. Arny's trial the government called four former patients as witnesses, all of whom began their treatment by seeing Dr. Saxman.  (Trial Day 2, at 186:14-22, 210:1-11, 234:12-16, and 256:8-11.)  Despite Dr. Saxman's intimate knowledge of the patients Dr. Arny was treating, their medical histories, and the reasoning behind placing them on the combination therapies, Dr. Arny's counsel did not interview Dr. Saxman.  Moreover, Dr. Arny's counsel did not ask her to testify at trial in support of his defense, particularly as to why these patients were on the medications prescribed to them.  In fact, Dr. Arny's counsel falsely represented to Dr. Arny that Dr. Saxman was out of the country at the time of his trial.[1]  (Arny Dec., at ¶5.)  The information provided by Dr. Saxman would have been beneficial to Dr. Arny.

### C.     Dr. Arny's Counsel Failed to File Any Motions *In Limine*.

Mr. Owens and Mr. Varney did little in with respect to pre-trial motions.  In fact, Dr. Arny's counsel did not file any motions *in limine* to exclude any personal information relating to Dr. Arny that may be disparaging.  For example, counsel did not attempt to exclude facts relating to the Kentucky Board of Medical Licensure ("KBML") investigation.  The government offered into evidence though a medical board investigator, the existence of KBML claims that were initiated against Dr. Arny.   (Trial Day 2, at 297:24-298:15.)   Specifically, the government offered into evidence statements made by Dr. Arny to the original medical board investigator in response to KBML's allegations.  *Id.* at 303:14-308:4.  Counsel made a verbal objection to the government's introduction of two additional documents relating to the KBML investigation.  *Id.* at 299:15-302:25.  However, ultimately, they agreed to allow the KBML medical investigator to read sections of Dr. Arny's statements into the record.  *Id.*  They even went so far as to allow the KBML medical investigator to authenticate Dr. Arny's signature.  *Id.* at 298:19-25; 299:12-14.

---

[1] Dr. Saxman confirmed during a telephonic interview with Dr. Arny's new counsel that she was in the country at the time of Dr. Arny's trial; however, she would not agree to sign an affidavit.  Dr. Arny respectfully requests a hearing on his Motion to have an opportunity to subpoena Dr. Saxman and present her testimony to the Court.

Mr. Owens even offered into evidence through Dr. Arny stipulations included in an Agreed Order of Surrender, in which Dr. Arny agreed to resolve the matter with KBML by surrendering his license.  (Arny Test., at 26:18-27:9.)   The government subsequently cross-examined Dr. Arny on both the fact that he agreed to surrender his license and specific stipulations in the Agreed Order.  *Id.* at 60:6-64:4. Evidence relating to the KBML investigation should have been excluded because it was not relevant to any issue at trial and only served to unfairly prejudice Dr. Arny.

Moreover, counsel did not attempt to limit the government's offering of the testimony of Keisha Wright.  Ms. Wright was a patient of Dr. Saxman for approximately one and one half years, and subsequently started seeing Dr. Arny for treatment.  (Trial Day 2, at 256:8-11, 258:2-3, and 258:22-259:1.)  Specifically, Ms. Wright alleged that Dr. Arny asked her to have a sexual relationship with her and asked her to move in with her while she was a patient.  *Id.* at 263:25-264:16.  When Dr. Arny's counsel cross-examined Ms. Wright, she acknowledged that the first time she told anyone that Dr. Arny allegedly asked her to move in with him was when Det. Lee visited her in jail, which resulted in her being sent to rehab.  *Id.* at 287:15-290:19.  However, when the government conducted its re-direct examination of Ms. Wright, she stated that she did not understand the questions Mr. Owens had asked of her.  *Id.* at 293:24-294:4.  This testimony is not relevant to any issue at trial and only served to unfairly prejudice Dr. Arny.  Ms. Wright's testimony clearly should have been limited.

Dr. Arny's counsel also did not attempt to exclude information regarding Dr. Arny's financial situation.  In fact, Mr. Owens introduced this information himself.  Specifically, Dr. Arny retired in 2009 and started to collect social security.  (Arny Test., at 12:9-12:17.)  However, once he decided to go back to work in 2010, he had to refund the full amount of social security

he received back to the Social Security Administration, over $22,000. *Id.* at 19:1-7. At the same time, Dr. Arny was supporting his five year old son on his own, and his adult daughter was recently divorced and she and her two teenage sons moved in with him. *Id.* at 13:13-22. The government used this evidence to show that Dr. Arny was desperate for cash in order to provide a rationale for him to work at PAAH. *Id.* at 37:24-25. Again, the facts relating to Dr. Arny's financial condition were not relevant to the issues before the Court, and were highly prejudicial. Neither Mr. Owens nor Mr. Varney objected to the introduction of this evidence, and in fact introduced it themselves.

Finally, counsel failed to exclude facts surrounding the allegations that Dr. Arny only examined young, attractive women. The government introduced this fact during opening and in its questioning of PAAH employees. Specifically, during the government's examination of Mr. Stapleton, he stated that Dr. Arny mainly saw pretty, young, skinny female patients. (Trial Day 2, at 36:17-23, 56:1-5.) Mrs. Stapleton testified that Dr. Arny typically saw "young and pretty girls, vets, Army men." *Id.* at 147:21-23. Moreover, during the government's cross-examination of Ivory Castle, Mrs. Stapleton's mother, she testified that after a period of time, Dr. Arny called his own patients to be examined, and that "[h]e liked young women, skinny women. He didn't like big women." (Trial Day 3, at 73:5-21). This information is not relevant, and again, was clearly only introduced to prejudice Dr. Arny.

Based on the significant failings of his counsel and for the reasons that follow, Dr. Arny now respectfully requests that this Court grant him a new trial.

## LAW AND ARGUMENT

Rule 33 states that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The Rule does

not define "interest of justice."  However, "Rule 33 recognizes that if a trial court concludes for any reason that the trial has resulted in a miscarriage of justice, the court has broad powers to grant a new trial."  3 *Federal Practice and Procedure*, Criminal, §581 (4th ed. 2014).  Several Circuits have found that the "interest of justice" standard "allows the grant of a new trial where substantial legal error has occurred."  *Munoz*, 605 F.3d at 373.  The Sixth Circuit has found that a violation of a defendant's Sixth Amendment right to effective assistance of counsel clearly meets this standard.  *Id.* citing *U.S. v. Bass*, 460 F.3d 830, 838 (6th Cir. 2006).  Courts also have held that trial courts have broad powers to grant a new trial even if it does not find that a specific legal error occurred at trial.  *See e.g., U.S. v. Scroggins*, 379 F.3d 233, 255 (5th Cir. 2004); *U.S. v. Vicaria*, 12 F.3d 195, 198-99 (11th Cir. 1994).

> [M]otions for new trial on the ground of newly discovered evidence are not favored, and are to be granted with caution.  It is a mistake to extend this proposition to motions for a new trial because of trial errors or other grounds.  Here the motion should be neither favored nor disfavored, and the question is only what the interest of justice requires.

*Scroggins*, 379 F.3d at 255 quoting 3 *Federal Practice and Procedure*, Criminal, §551 (3rd ed. 2004).

The Sixth Circuit has not addressed the question as to "whether a district court may grant Rule 33 relief where the verdict is not against the substantial weight of the evidence, and where no reversible error or violation of the defendant's substantial rights has occurred, but where the district court nonetheless believes that 'the interest of justice' requires a new trial."  *Munoz*, 605 F.3d at 374.  In the Sixth Circuit's *Munoz* opinion, Judge Boggs stated that question has particular significance "where a defendant … establishes that trial counsel's performance was in some way substandard, although not egregious enough to constitute a Sixth Amendment right-to-

10

counsel violation …." *Id.* The Sixth Circuit referred to this middle ground as "ineffective assistance light." *Id.*

In *Munoz*, the Sixth Circuit conducted a thorough analysis of the "ineffective assistance light" argument. *Id.* at 374-76. In conducting its analysis, the Sixth Circuit relied on opinions in both the Fifth and Eleventh Circuits which interpret the "interest of justice" as a broad standard that may be invoked absent a specific legal error at trial. *Id.* at 374 citing *U.S. v. Vicaria*, 12 F.3d 195, 198-99 (11th Cir. 1994); *U.S. v. Scroggins*, 379 F.3d 233, 256-57 (5th Cir. 2004). The Sixth Circuit has never fully considered the viability of an "ineffective assistance light" claim or "the broader question of whether Rule 33 relief may be granted based on amorphous claims of trial unfairness that do not constitute reversible error." *Munoz*, 605 F.3d at 375.

The *Munoz* Court did point out that the Sixth Circuit has repeatedly cited and applied *Strickland* in holding that a district court did not abuse its discretion in *refusing* to grant a new-trial motion on ineffective assistance grounds. *Id.* The court cited a series of Sixth Circuit cases in support of this proposition; however, to the extent the cases cited address *Strickland*, it is likely because the parties argued that the *Strickland* standard should apply. *Id.* citing, *U.S. v. Holycross*, 333 Fed. Appx. 81, 84 (6th Cir. 2009) (applying the *Strickland* standard which Defendant argued as the applicable standard in his Appellate brief); *U.S. v. Allen*, 254 Fed. Appx. 475, 476-78 (6th Cir. 2007) (denying Defendant's claim for ineffective assistance due to insufficient evidence); *Bass*, 460 F.3d at 838 (rejecting defendant's argument that the lower court abused its discretion by failing to hold a hearing on defendant's ineffective assistance argument under the *Strickland* standard); *U.S. v. Garcia*, 19 F.3d 1123, 1126 (6th Cir. 1994) (finding defendant's argument that the lower court applied the *Strickland* test incorrectly deficient). In other words, it appears that the Sixth Circuit has not addressed the ineffective assistance

11

argument based on some standard other than *Strickland* because that argument has not been presented to the court.

Similarly, the defendant in *Munoz* argued that the *Strickland* standard was applicable to the facts of that case. *Munoz*, 605 F.3d at 376. In light of the fact that the parties argued the *Strickland* standard, the Court determined to leave the question as to whether a defendant should be entitled to a new trial under an "ineffective assistance light" argument for another day. *Id.* However, before dismissing it entirely, the Sixth Circuit clearly suggested the argument is viable. The *Munoz* district court granted the defendant's Rule 33 Motion. *Id.* at 366. In the Sixth Circuit's review of the district court's ruling, at the conclusion of its "ineffective assistance light" analysis, the court noted that it "often affirm[s] incorrectly reasoned district court judgment on alternative bases," but since the parties had never addressed the "ineffective assistance light" argument, and due to the uncertainty in the law, it chose not to do so at that time. *Id.* The Sixth Circuit ultimately reversed the *Munoz* trial court's findings, and found that the defendant was not entitled a new trial based on ineffective assistance of counsel under the *Strickland* standard. *Id.* at 376-82. However, based on the dicta, it appears that the Court would have affirmed the district court's holding had the parties presented an "ineffective assistance light" argument.

The case presently before this Court is a case in which the Court should grant a new trial pursuant to Rule 33 based on an "ineffective assistance light" theory. Regardless of whether Dr. Arny suffered a violation of his Constitutional right to effective assistance of counsel, his defense at trial was clearly substandard, which resulted in him not receiving a fair trial. Dr. Arny was prejudiced as a result of his counsel's representation because they did not file a *Daubert* motion, they failed to interview the physician who preceded Dr. Arny

12

at PAAH, and they failed to file any motions *in limine*.  For the reasons that follow, the combination of these failures resulted in a miscarriage of justice, entitling Dr. Arny to a new trial.

I.     **DR. ARNY'S COUNSEL DID NOT FILE A *DAUBERT* MOTION.**

The government presented Det. Hunter as an expert witness to opine on the characteristics of a pill mill, and that based upon those characteristics, PAAH was a pill mill. (Aug. 5 Hearing Trans., at 5:21-6:24.)  Both the Stapletons and Dr. Acosta filed a *Daubert* motion to exclude Det. Hunter's testimony as an expert witness, arguing that Det. Hunter's opinions were based on speculation, hearsay, and medical opinions he was not qualified to render.   (DN 127 and 133; *see also,* Aug. 5 Hearing Trans., at 111:13-15.)   Despite the detrimental nature of Det. Hunter's opinions to Dr. Arny, Dr. Arny's counsel did not file a *Daubert* motion, and in fact, did not even bother to appear at the August 5, 2013 hearing when Det. Hunter's opinions were presented.  (DN 160, Minutes of *Daubert* Hearing.)

At the conclusion of the August 5, 2013 hearing, the Court allowed all parties, including Dr. Arny, to submit additional briefing regarding Det. Hunter's opinions based upon the August 5, 2013 hearing.  (Aug. 5 Hearing Trans., at 111:13-15.)  However, again, Dr. Arny's counsel did not file any pleadings regarding Det. Hunter.  Ultimately, the Court issued an order on the co-defendants' *Daubert* motions limiting Det. Hunter's expert opinions to only the general characteristics of a pill mill.  (*Daubert* Order, at 3-4.)  During Det. Hunter's testimony at trial, the Court asked Mr. Owens if he had any objection to Det. Hunter testifying as an opinion witness, to which Mr. Owens responded "No."  (Trial Day 3, at 34:15-17.)[2]

---

[2] It should be noted that Mr. Owens represented to the Court that he was present at the hearing where Detective Hunter was cross-examined about his qualifications and counsel questioned his ability to testify as an opinion witness.  (Trial Day 3, at 35:4-10.)  He went on to state that he felt the question were better reserved for his

To the extent the Court's limitation on Det. Hunter's testimony was applicable to Dr. Arny's trial, Det. Hunter testified beyond that to which he was allowed.  Det. Hunter not only testified to the characteristics of a "pill mill," but he also testified that the characteristics and practices of PAAH fit the characteristics of a pill mill.  For example, Det. Hunter testified that the fact that patients were referred to other doctors was "common" for pill mills  *Id.* at 42:10-15. Det. Hunter testified that it is "typical" that Dr. Arny discharged patients from PAAH because "[t]hey're trying to put on the air of a legitimate medical facility."  *Id.* at 42:19-22; 53:14 – 54:5. When asked about Dr. Arny's use of MRIs and x-rays, Det. Hunter responded "Absolutely. They always do that.  It's another way of generating cash."  *Id.* at 42:23-25.  Dr. Arny's counsel asked Det. Hunter about a patient whose medication was decreased, to which he responded, "Yeah.  That's common."  *Id.* at 43:15-18.  Similarly, Det. Hunter testified that patient contracts and treatment plans, like those used by Dr. Arny, are "always" in the patient files.  *Id.* at 45:12-20.  Again, Det. Hunter explained that these are part of the "ruse" of a legitimate medical facility.  *Id.* at 56:4-16.

Ultimately, not only was Det. Hunter allowed to testify as to the characteristics of a pill mill, but he also was allowed to testify that the practices and characteristics of PAAH fit the characteristics of a pill mill.  The Court's Order on the co-defendants' *Daubert*  motions states "Detective Hunter's testimony about the usual features of pill mills is fair game, but his opinion analyzing the Stapleton's pain clinic is 'substantially outweighed' by the danger of unfair prejudice."  (*Daubert* Order, at 11-12.)  The Court went on to state,

> Analysis of the Stapleton's clinic justifies exclusion, however, because it unduly risks misuse by the jury.  When a law enforcement expert offers a "point by point examination of profile characteristics with specific reference" to the defendant, there is a particularly acute risk that the jury will convict simply

---

testimony at trial.  *Id.*  However, the record is clear that Mr. Owens was not present at the *Daubert* Hearing regarding Det. Hunter's opinion.  [DN 160, Minute Entry Daubert Hearing, August 5, 2013.]

because the defendant fits the profile.  *See United States v. Quigley*, 890 F.2d 1019, 1023-24 (8th Cir. 1989).  Since the jury is competent to make the comparison in this case on its own, linking the traits of a typical pill mill to the defendants' clinic carries a significant risk of unfair prejudice without adding much probative value.  That risk substantially outweighs whatever minimal probative value Detective Hunter's analysis of the defendants' clinic might add.  Hunter therefore may not address whether the Stapletons' clinic displays any of the usual characteristics of pill mills.  While he is free to discuss pill mills generally, applying that testimony to the facts of this case is up to the jury.

*Id.* at 13.

Det. Hunter's testimony regarding the characteristics of PAAH during trial was extremely prejudicial to Dr. Arny.  The government was allowed to present an "expert" to the jury that gave the appearance that it was his opinion that *this* clinic was a pill mill.  Moreover, his testimony suggested that there is no such thing as a legitimate pain clinic because even the purported legitimate medical practices at such clinics were just a ruse, an opinion he has no qualification to give.

Dr. Arny was prejudiced by the Detective's testimony, which lies square on the shoulders of his counsel.  Dr. Arny's counsel took no steps to object to Det. Hunter's testimony or limit it by filing a *Daubert* motion.  Even once the Court entered an Order limiting the Detective's testimony as a result of co-defendants' *Daubert* motions, Dr. Arny's counsel failed to take steps to limit Det. Hunter's testimony to that which was allowed pursuant to the Court's Order.  Indeed, it was actually Dr. Arny's counsel who elicited the testimony regarding the specific characteristics of PAAH and allowed the Detective to apply the characteristics of a pill mill to PAAH.  As a result of Dr. Arny's counsel allowing this testimony, it is highly probable that the jury decided to convict Dr. Arny simply because the Detective demonstrated that PAAH fit the profile of a pill mill.  Dr. Arny's counsel's failure to enforce the Court's order cannot be

attributed to any type of reasonable trial strategy.  The Detective's testimony was extremely prejudicial to Dr. Arny, and should have been excluded.

## II.   DR. ARNY'S COUNSEL FAILED TO INTERVIEW HIS PREDECESSOR, DR. SAXMAN.

Second, neither Mr. Owens nor Mr. Varney interviewed Dr. Saxman to determine whether she would be a helpful witness to Dr. Arny.  As the Court well knows, Dr. Saxman was the primary physician at the clinic from approximately March 2009 to March 2010.  Dr. Saxman provided medical services to a stable panel of patients without serious complications, adverse events, or complaints.  She prescribed medications based on her medical judgment, and adjusted medications depending upon how the patients responded.  Dr. Arny reviewed Dr. Saxman's records for her patients and continued the medical care plan she put in place for them.  (Arny Dec. at ¶3.)  Dr. Arny did adjust medications based on his examination of the patients.  *Id.*  Some patients were so upset by the reduction in their medication doses that they sought care elsewhere, including driving to Lexington to continue to see Dr. Saxman.  *Id.* at 4.

Despite Dr. Saxman's intimate knowledge of the patients Dr. Arny was treating, their medical histories, and the reasoning behind placing them on the combination therapies, Dr. Arny's counsel did not interview Dr. Saxman in preparation for trial.  Moreover, Dr. Arny's counsel did not ask her to testify at trial in support of his defense, particularly as to why these patients were on the medications prescribed to them.   In fact, Dr. Arny's counsel falsely represented to him that Dr. Saxman was out of the country at the time of his trial.  (Arny Dec. at ¶5.)  However, Dr. Saxman confirmed in a telephonic interview with Dr. Arny's new counsel that this is not accurate.  Dr. Saxman's information would have been beneficial to Dr. Arny and provided legitimacy to the practice.

Again, Dr. Arny's counsel's failure to even interview Dr. Saxman cannot be attributed to any type of reasonable trial strategy.  The government called four former patients as witnesses, all of whom began their treatment by seeing Dr. Saxman.  (Trial Day 2, at 186:14-22, 210:1-11, 234:12-16, and 256:8-11.)  Indeed, three of them testified that Dr. Arny either did not change their dosage or decreased their dosage upon taking over their care.  *Id.* at 187:23-188:7, 189:23-190:1, 225:17-227:4, 235:25-236:1, 237:15-19.  Dr. Arny's counsel unquestionably should have, at a minimum, interviewed Dr. Saxman.

Even worse, Dr. Arny's counsel falsely told him that Dr. Saxman was out of the country during the time of trial and unavailable to be subpoenaed.  If Dr. Arny had known that she was available, he would have insisted that she be called as a witness.  If his counsel had failed to do so, he could have sought the assistance of court.  Dr. Arny's counsel's actions prevented him from calling an important witness, which clearly prejudiced him at trial.

## III.   DR. ARNY'S COUNSEL FAILED TO FILE ANY MOTIONS *IN LIMINE*.

Dr. Arny's counsel did not file any motions *in limine* to exclude any personal information relating to Dr. Arny that may be disparaging.  In order for evidence to be admissible, it must be relevant.  Fed. R. Evid. 402.  The Federal Rules of Evidence define relevancy as a "tendency to make a fact more or less probable than it would be without the evidence; and … the fact is of consequence in determining the action."  *Id.*  Relevant evidence in a criminal case is any evidence that tends to prove or disprove an element of the offense.  Relevant evidence should be excluded where the probative value of such evidence is substantially outweighed by its potential for unfair prejudice, confusing the jury, or misleading the jury.  Fed. R. Evid. 403.  "Unfair prejudice" means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  Fed. R. Evid. 403, Advisory Committee's Notes.

17

A.      **The KBML Investigation.**

First, counsel did not attempt to exclude facts relating to the KBML investigation, including written statements Dr. Arny made to investigators and the fact that he agreed to surrender his license.  Evidence relating to KBML's claims were not relevant to any issue at trial, and only served to unfairly prejudice Dr. Arny.

The Indictment charges Dr. Arny with three counts of knowingly and intentionally conspiring to distribute and unlawfully dispense controlled substances in violation of 21 U.S.C. §841.   Although 21 U.S.C. §841 generally prohibits distribution of drugs, physicians, pharmacists, and those assisting them may do so pursuant to a prescription "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."  21 C.F.R. § 1306.04(a).   The terms "legitimate medical purpose" or "usual course of professional practice" are not defined in the statute or regulation, but courts have defined them to refer to "generally accepted medical practice."  *See U.S. v. Moore*, 423 U.S. 122, 142-43 (1975) (upholding conviction of physician who did not comply with "an accepted standard of medical practice"); *U.S. v. Johnson*, 831 F.2d 124, 127 (6th Cir. 1987) ("usual course of professional practice").   None of these elements are aided or made in any way more probable by the existence of the KBML investigation.  Even to the extent that the KBML's investigation and the offenses charged are founded on an overlapping body of underlying facts, the fact that KBML investigated Dr. Arny is not necessarily a fact bearing on the offenses charged.

Even if the Court found that the fact that Dr. Arny was investigated was relevant, it still should have been improper for admission at trial under Federal Rule of Evidence 403.   In this case, the fact that the KBML investigated Dr. Arny would clearly suggest a decision on an

improper basis so as to constitute unfair prejudice, confusion, and misleading the jury.   The KBML, a state administrative agency, conducted its investigation based on the Kentucky statutes and administrative code, which are entirely separate and distinct from the offenses for which Dr. Arny was charged.   The standards set by the KBML for physician behavior are not the same as standards set by the federal criminal laws controlling this case, and even a well-founded KBML claim does not equate to a violation of federal criminal law.   Suggesting that KBML's claims alleged against Dr. Arny are to be taken as propositions of circumstances against him in his federal prosecution only served to distract from the true questions at issue and suggest a decision on an improper basis.

Significantly, in lieu of a revocation hearing, which would have been a great financial expense, Dr. Arny voluntarily entered into an agreement to surrender his license.   As part of the Agreement, Dr. Arny denied any wrongdoing or violation.   (Arny Test., at 26:18-27:2.) Ultimately, while the Board consultant reached certain conclusions regarding Dr. Arny's medical practices, there were never any formal findings of wrong doing.   Therefore, even if the KBML's claims did have some minimal relevance, the probative value would clearly be outweighed by the potential for unfair prejudice, confusion, and misleading the jury.   The documents and testimony relating to the KBML investigation should have been excluded.

B.     The Testimony of Keisha Wright.

Similarly, Dr. Arny's counsel should have moved to limit the testimony of Keisha Wright.   Ms. Wright gave highly inflammatory testimony in that she alleged that Dr. Arny asked her to have a sexual relationship with her and asked her to move in with him.   (Trial Day 2, at 263:25-264:16.)   These facts are not relevant because they do not aid or make any of the elements of the charges against Dr. Arny more or less probable.   While Dr. Arny denies making

any such suggestion to Ms. Wright, this testimony bears no weight on whether Dr. Arny issued prescriptions for a "legitimate medical purpose" or in "usual course of professional practice."

Alternatively, even if the Court found Ms. Wright's testimony was relevant, Ms. Wright's testimony should have been excluded because it was highly prejudicial under Fed. R. Evid. 403. Ms. Wright's testimony that Dr. Arny asked her to have a sexual relationship with him would clearly suggest decision on an improper basis so as to constitute unfair prejudice, confuse, and mislead the jury.  Such testimony easily would enflame the jury and create an emotional response to Dr. Arny that is not applicable to the elements of charges asserted against him.  The prejudice Dr. Arny suffered from this testimony highly outweighed any probative value it may have had.  Thus, Dr. Arny's counsel should have moved to exclude it.

### C.    Dr. Arny's Finances.

Counsel did not attempt to exclude information regarding Dr. Arny's finances.  Again, none of the elements of the charges against Dr. Arny are aided or made in any way more or less probable by Dr. Arny's financial situation.  Indeed, his financial situation bears no weight on whether he issued prescriptions for a "legitimate medical purpose" in the "usual course of professional practice."  Simply because an individual works to earn money to pay his or her bills bears no weight on how that individual performs at his or her job.  While the government's expert testified that certain doctors with checkered histories may go to work for pill mills because they have no other option, it presented no evidence to suggest that was the case with respect to Dr. Arny.  The mere fact that Dr. Arny owed money to the Social Security Administration, paid alimony and child support, and was supporting his daughter and grandchildren in no way supports the government's charges.

Alternatively, even if the Court found Dr. Arny's financial condition relevant, it should still exclude that evidence because it would clearly suggest a decision on an improper basis so as to constitute unfair prejudice, confusion, and misleading the jury.   The government painted a picture that Dr. Arny "needed money bad."  (Arny Test., at 37:24-25.)  This evidence prejudiced Dr. Arny because it suggested a decision on an improper basis that Dr. Arny would do anything for money, which the evidence did not support.

> **D.    The Alleged Characteristics of Dr. Arny's Patients.**

Finally, counsel failed to exclude facts surrounding the allegations that Dr. Arny only examined young, attractive women.  The government introduced this fact during opening and in its questioning of PAAH employees.  The testimony equated to nothing more than subjective opinions that bear no weight to the issues before the Court.  Again, none of the elements of the charges against Dr. Arny are aided or made in any way more probable by the alleged characteristics of Dr. Arny's patients.  Moreover, this prejudicial and inflammatory testimony was clearly only intended to create an emotional response from the jury.  The government painted a picture of Dr. Arny to fit its description of doctors who work for pill mills.  Ultimately, the allegation that Dr. Arny preferred particular patients is not relevant.  Even if the Court found it relevant, the prejudicial value far outweighs any probative value.  The testimony relating to Dr. Arny's patients should have been excluded.

Based on the foregoing, it is clear that Dr. Arny's counsel's failure to file any motions *in limine* prejudiced him during his trial.

## CONCLUSION

Based on the foregoing, Dr. Arny respectfully requests that the Court grant him a new trial.  While counsel's performance may not have been so egregious that it deprived Dr. Arny of

his Sixth Amendment right, it was certainly so poor that it resulted in a miscarriage of justice. Based on the *Munoz* opinion, there is clearly precedence for the Court to consider an ineffective assistance of counsel argument based on a standard less than that set forth in *Strickland*.  The case presently before the Court is the type of case to which Judge Boggs was referring in the *Munoz* opinion.  The accumulation of each of Dr. Arny's prior counsel's failures resulted in a miscarriage of justice.  Based on Dr. Arny's counsel's lackluster and substandard performance, this Court should find that the interest of justice requires granting Dr. Arny a new trial. Defendant further requests that if the Court deems it appropriate, that it hold an evidentiary hearing on Dr. Arny's Motion.

Respectfully submitted,

/s/ Kent Wicker
Kent Wicker
Nicole S. Elver
Lesley Bilby
DRESSMAN BENZINGER LAVELLE PSC
321 W. Main St., Suite 2100
Louisville, Kentucky 40202
Telephone: (502) 572-2500
Facsimile: (502) 572-2503
E-Mail:  kwicker@dbllaw.com

*Counsel for Dr. Stephen Arny*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing document has been served via CM/ECF upon all parties in this action this 9th day of March, 2015.

/s/ Kent Wicker
Kent Wicker