UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Criminal No. 12-11-ART-(3) |
| ) | |
| v. ) | |
| ) | |
| ) | **MEMORANDUM OPINION AND** |
| STEPHEN C. ARNY, M.D., ) | **ORDER** |
| ) | |
| Defendant. ) | |
| ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

The right to counsel guarantees more than an attorney who will stand next to you at trial. Rather, the Sixth Amendment "envisions counsel[] playing a role that is critical to the ability of the adversarial system to produce just results." *Strickland v. Washington*, 466 U.S. 668, 685 (1984). Specifically, defense counsel's role is to put the prosecution's case to the test. *See id.* ("[A]ccess to counsel's skill and knowledge is necessary to accord defendants the ample opportunity to meet the case of the prosecution." (internal quotations omitted)). To do so, counsel must investigate his or her client's case, and interview, prepare, and call key witnesses on his or her client's behalf. Of course, a failure to do some or even all of these things does not automatically mean counsel is constitutionally ineffective. But a violation of these duties provides an opportunity to inquire into whether counsel's actions or inactions prejudiced his client. The ultimate question is whether "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Id.* at 686. Here, the answer is yes. Dr. Stephen Arny's trial counsel's inaction helped his adversary—*i.e.*, the government—convict him of

conspiracy to distribute controlled substances.   Thus, Dr. Arny's counsel provided constitutionally ineffective assistance, so Dr. Arny is entitled to a new trial.

## BACKGROUND

Pain is not like a broken leg, torn muscle, or tumor; objective tests can neither prove nor disprove the existence of pain.   Doctors can of course use objective tests to identify an injury that might cause pain.   But doctors must rely on their patients' subjective reports to determine the level of pain their patients are experiencing.   It is now common for doctors to treat pain with medication, including opiates.[1]   And although doctors can use their intuition and experience to guide them as to when and how much pain medication is appropriate, there is no magic formula.   One place where doctors focus on treating pain is a pain clinic.   Ray and Tina Stapleton founded one such clinic in Auxier, Kentucky, called Paintsville Auto Accident Healthcare ("PAAH").   The Stapletons—Dr. Arny's eventual employers— struggled to keep doctors at PAAH, so they used a recruiter to obtain a temporary doctor until they could find a permanent one.

Dr. Arny was not a specialist in pain management.   Rather, he was trained as a pathologist and worked in the military for most of his career. R. 308 at 8–12 (trial testimony of Dr. Arny).   Dr. Arny initially retired from medicine in 2009, when he was in his early 60s. *Id.* at 12.   A year later, Dr. Arny ran into financial troubles and thus decided to return to work.   *Id.* at 13.   After Dr. Arny failed to secure work as a pathologist, he received a job offer from Ray and Tina Stapleton.   *Id.* at 13, 14.   The Stapletons were looking for a doctor

---

[1] The Court takes no position on whether pain should be treated in this manner.  That decision is better left to the doctors and experts.  For a thorough and very thoughtful analysis of how pain management evolved to its current state, one can read *Dreamland* by Sam Quinones (2015).

to work at their clinic until they could find a doctor who was certified in pain management. *Id.* at 14.

Dr. Arny began working at PAAH in August 2010.  He inherited most of his patients from Dr. Doina Saxman, his predecessor at PAAH, and he continued to treat his new patients in accordance with her plans.  *Id.* at 16, 20.  But one month after starting his job at PAAH, Dr. Arny realized it was not a good fit, so he gave the Stapletons notice.  *Id.* at 16.  The Stapletons expected Dr. Arny to see 30 to 35 patients a day, and Dr. Arny felt that he could not adequately treat so many patients in so short a time.  *Id.*  Soon after he left, though, the Stapletons convinced Dr. Arny to return to the clinic until they could find a permanent replacement for him.  *Id.* at 17–18.  As an incentive, the Stapletons offered to double Dr. Arny's pay from $120 to $240 an hour and to make changes to allow Dr. Arny to better serve his patients.  *Id.*; R. 306 at 32 (testimony of Detective Hunter).  Dr. Arny remained at PAAH through November 2011.

On August 2, 2012, a grand jury indicted Dr. Arny, the Stapletons, and Dr. Emmanuel Acosta (Dr. Arny's successor), for conspiring to distribute and unlawfully dispense several controlled substances in violation of 21 U.S.C. § 841(a)(1).  R. 1 (indictment).[2]  The Court appointed Wesley "Kent" Varney to represent Dr. Arny.  R. 16 (minute entry order for arraignment).  Immediately thereafter, Dr. Arny retained Varney and Stephen Owens (taken together, "previous counsel") to represent him.  *Id.*

Dr. Arny went to trial on September 15, 2014.  Because Dr. Arny prescribed the drugs through his medical work, the government bore the burden to prove that Dr. Arny conspired

---

[2] Dr. Arny was charged with conspiracy to distribute and unlawfully dispense three controlled substances: Oxycodone, Hydrocodone, and Xanax.  R. 279 at 13.

with others to distribute controlled substances "outside the course of ordinary medical practice." R. 279 at 13 (jury instructions). To prove that Dr. Arny operated "outside the course of ordinary medical practice," the government needed to show that Dr. Arny did not issue the drugs for a legitimate medical purpose and in the usual course of medical practice. *Id.* at 16.

To try to prove these two elements, the government relied mostly on the testimony of (1) medical expert Dr. Paul Harries and (2) four of Dr. Arny's prior patients. Dr. Harries testified that Dr. Arny did not examine his patients, did not have valid doctor-patient relationships, and prescribed a "toxic" combination of medications to patients without a demonstrated medical need. *See* R. 284-1 at 33–35, 114–15. Dr. Harries opined that Dr. Arny had not prescribed these medications "for a legitimate medical purpose" or "in the usual course of medical practice." *Id.* at 40. Four of Dr. Arny's patients testified consistently with Dr. Harries. Specifically, they testified that Dr. Arny did not examine them thoroughly or ask them any questions. *See* R. 305 at 185–247, 252–295. They also testified that they saw Dr. Arny to feed a drug habit, not because they legitimately needed pain medication. *See id.* In total, the government called 15 witnesses, including the Stapletons, two detectives, and an official from the Kentucky Board of Medical Licensure ("KBML").

On the other hand, after two years of representing Dr. Arny, previous counsel called only three witnesses on Dr. Arny's behalf. One of these witnesses was Dr. Arny himself. He testified that he was just following Dr. Saxman's treatment plans when he arrived at PAAH. R. 308 at 20. Dr. Saxman was not indicted in the case; in fact, she is still practicing medicine in Lexington, Kentucky. R. 419 at 41 (testimony of Dr. Saxman at evidentiary hearing). Dr. Arny repeatedly asked previous counsel to call Dr. Saxman as a witness for him. *See* R. 405-

4

1 at 3–8 (emails from Dr. Arny to previous counsel).  But they did not call Dr. Saxman to testify.

Previous counsel also called a medical expert, Dr. William Ackerman.  Dr. Ackerman testified that, under the KBML rules, Dr. Arny was not required to examine every patient at every visit.  R. 281 at 57.  Dr. Ackerman also stated that he believed Dr. Arny was just making the best of a bad situation, and that Dr. Arny was not actually involved in the conspiracy.  *Id.* at 50–51 ("[B]ecause of Dr. Arny's lack of experience in prescribing medications as well as his lack of experience treating pain patients, it is my professional opinion he's not trying to be part of a pill mill in eastern Kentucky . . . .").  However, Dr. Ackerman did little else to help Dr. Arny's case.  *See id.*  For example, Dr. Ackerman admitted that Dr. Arny "did not follow the standard of care" because he "had no standard of care."  *Id.* at 51.  Dr. Ackerman also agreed with the government that a doctor engaged in pain treatment should "definitely" have training in pain management.  *Id.* at 37–38.  Finally, Dr. Ackerman testified that he reached his conclusion that Dr. Arny was not involved in the conspiracy without knowing that patients at PAAH paid in cash or that Dr. Arny's pay doubled when he agreed to return to the clinic.  *Id.* at 39, 43.  The government later used these three statements to lend support to its argument that Dr. Arny prescribed medications outside "the usual course of medical practice."  In fact, the government's attorney did an effective job of turning this testimony against Dr. Arny.  R. 307 at 7 ("I listened to the testimony of Dr. Ackerman.  In some ways—and I say this as a joke—I feel like he should have been a prosecution witness.   Felt like maybe we should send him a check because he certainly wasn't on the side of Dr. Arny.  Not in the slightest.").

5

Finally, previous counsel called Tina Stapleton's mother, Ivory Castle, who worked in a nurse-type position at PAAH while Dr. Arny worked there. On May 30, 2014, over three months before the trial, Dr. Arny told previous counsel to call Ms. Castle. R. 405-1 at 7; *see also id.* at 5 ("I want the jury to hear from Dr. Ackerman, Dr. Saxman, the nursing staff, patients I helped, and a representative from [an] MRI facility."). Even so, previous counsel failed to meet with her at all; she went to the stand unprepared. *See* R. 306 at 79.

The defense called no other witnesses. Previous counsel did not call any patients that Dr. Arny helped and thus were unable to rebut the testimony of the patients who testified for the government. They did not call Dr. Saxman to testify that her treatment plan—which Dr. Arny followed—was based on legitimate medical need. *See id.* at 3. Instead, previous counsel called a medical expert whose testimony partially bolstered the government's case, a witness whom they had not prepared, and the defendant himself. Then they rested.

After the three-day trial, Dr. Arny was convicted of conspiracy to distribute and unlawfully dispense controlled substances. Shortly after his conviction, Dr. Arny retained new lawyers to examine his case. Dr. Arny's new counsel filed a motion under Federal Rule of Criminal Procedure 33 arguing that Dr. Arny was entitled to a new trial on the basis of ineffective assistance of counsel. R. 336. For the reasons stated below, that motion is granted.

## DISCUSSION

Under Federal Rule of Criminal Procedure 33, the court may grant a defendant's motion for a new trial if "the interest of justice so requires." Fed. R. Crim. P. 33(a). Rule 33 does not define the "interest of justice," however, and courts have struggled to determine the meaning of those words. *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989).

Instead of creating an overarching standard, courts have taken a piecemeal approach, detailing what "the interest of justice" requires in specific situations. Whatever else the interest of justice requires, courts unanimously agree that it requires a new trial if defense counsel provides constitutionally deficient assistance. *United States v. Munoz*, 605 F.3d 359, 373–74 (6th Cir. 2010) (listing cases).

At the Rule 33 stage, the trial judge has just witnessed the trial and thus is in a unique position to assess the errors of counsel and the effect of those errors on the outcome of the case. While this vantage point provides the trial judge with advantages over reviewing a cold record, it does not change the standard. The defendant still must show that his attorney was constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984). *Munoz*, 605 F.3d at 366–67. *Strickland* held that, to show constitutionally-ineffective assistance, a defendant must first show that his attorney's conduct "fell below an objective standard of reasonableness." 466 U.S. at 688.

## I.    *Strickland* Deficiencies

Counsel's conduct is objectively unreasonable under *Strickland* if, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. Courts may look to prevailing professional norms to define "professionally competent assistance." *Id.* However, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Dr. Arny alleges that previous counsel made eight errors so egregious that the Court cannot indulge that presumption here. The three errors that rise to the level of *Strickland* deficiencies are discussed below.

### a.      Previous counsel lied to Dr. Arny

On several occasions, Dr. Arny asked previous counsel to call Dr. Saxman as a witness during his trial.  R. 405-1 at 1 (Dr. Arny affidavit); *id.* at 3–8 (emails between Dr. Arny and previous counsel).  He noticed that Dr. Saxman was not indicted, even though he prescribed the same combination of pills she did.  Thus, Dr. Arny believed that Dr. Saxman might be able to provide helpful testimony.  R. 405-1 at 3.  In an email to previous counsel, Dr. Arny stated, "I see Dr. Saxman is actively practicing medicine in Lexington, Kentucky and I am charged with a felony.  What did I do that she did not do? . . . I want to call my predecessor, Dr. Saxman, as a witness in my defense." *Id.*  A month later, though, previous counsel wrote to Dr. Arny that Assistant United States Attorney Roger West told them that "Dr. Saxman has either a deal in place or soon will be indicted.  Following her time at [PAAH].  Her Lexington clinic was searched." *Id.* at 8.  None of that was true, and Mr. West never made such a statement to previous counsel.  *See* R. 429 at 25.

Dr. Arny argues that previous counsel's lie about Dr. Saxman was constitutionally-unreasonable conduct under *Strickland*. Lawyers have an ethical duty not to lie to their clients.  *See* Lisa Lerman, *Lying to Clients*, 138 U. PA. L. REV. 659, 661 & n.2 (1990).  And, although the Model Rules of Professional Responsibility ("Model Rules") do not explicitly prohibit lawyers from lying to their clients, Model Rule 8.4(c) states that "it is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."   Model Rule 1.4(b) also requires lawyers to explain matters "to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."  Here, previous counsel falsely told Dr. Arny that Dr. Saxman was going to

be indicted, thus depriving him of the ability to make an "informed decision" about whether she should testify on his behalf.  And previous counsel certainly "engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation."  Previous counsel's misrepresentation to Dr. Arny therefore fell below prevailing professional norms and hence was deficient conduct under *Strickland*.

### b.    Previous counsel failed to interview Dr. Saxman or call her as a witness

Dr. Arny also alleges that previous counsel erred when they decided not to interview Dr. Saxman.  Under *Strickland*, counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  466 U.S. at 691.  "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  *Id.* at 691.  Counsel's decision not to investigate is more likely to be unreasonable if the defendant told them to interview a witness and gave a reasonable explanation for this request.  *Id.* ("Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.").  Whether an investigation decision was reasonable "depends critically" on the information the defendant supplied to counsel.  *Id.*

Dr. Arny explained to previous counsel that he continued Dr. Saxman's treatment plans because she noted that they had been effective.  R. 405-1 at 3.  Though the government implied that Dr. Saxman's treatment plans were illegitimate, *see* R. 284-1 at 33–35 (deposition of Dr. Harries) (noting that Dr. Arny was prescribing a toxic combination of medications); R. 281 at 25 (deposition of Dr. Ackerman) (stating that Dr. Arny prescribed medications initially ordered by Dr. Saxman), Dr. Saxman was not indicted and was still

9

practicing medicine.  R. 405-1 at 3.  Therefore, Dr. Arny reasonably believed her testimony would demonstrate that he did not conspire with the Stapletons, as it would show that he prescribed the drugs for a legitimate medical purpose.  *Id.*  Despite Dr. Arny's repeated requests and persuasive reasons for Dr. Saxman to testify at his trial, previous counsel still did not interview Dr. Saxman or call her as a witness.  *See* R. 277 (exhibit and witness list).[3] Thus, counsel's failure to interview Dr. Saxman seems unreasonable.

The government responds that previous counsel's decision not to interview Dr. Saxman was strategic.  Unlike Dr. Arny, Dr. Saxman had examined every patient before prescribing pain medication, so previous counsel determined her testimony would be more harmful to Dr. Arny than helpful.  R. 404-1 ¶ 2.  As an initial matter, it is unclear how harmful this testimony would have been.  First, Dr. Arny was not required to examine patients at every visit before issuing prescriptions.  *See* R. 281 at 57 (deposition of Dr. Ackerman); R. 284-1 at 27–30 (deposition of Dr. Harries) (explaining that doctors prescribing this level of pain medication should examine patients at every visit before issuing prescriptions but were not required to do so under KBML rules at the time).   As such, the fact that Dr. Arny did not examine patients at every visit was only circumstantial evidence that he was prescribing pain medications outside "the usual course of medical practice."  On the other hand, Dr. Saxman could have explained why she believed her treatment plans were medically necessary.  So Dr. Saxman's testimony would have rebutted the government's

---

[3] Previous counsel did hire a private investigator to subpoena Dr. Saxman in June 2014, but Dr. Saxman was out of the country, so he could not serve her.  R. 419 at 36–37 (testimony of private investigator).  Previous counsel did not attempt to subpoena Dr. Saxman again, *id.* at 38, even though Dr. Arny's trial was postponed twice.  R. 247 (rescheduling Dr. Arny's trial for August 18, 2014); R. 269 (rescheduling trial for September 15, 2014).  Dr. Arny alleges that previous counsel told him Dr. Saxman could not testify at his trial because she was out of the country at the time of the final trial date.  R. 405-1 at 1 (affidavit of Dr. Arny); *but see* R. 419 at 42 (testimony of Dr. Saxman) (noting that Dr. Saxman was in the United States during Dr. Arny's trial).

direct evidence that Dr. Arny could not have had a legitimate medical purpose for prescribing the drugs because the combination of drugs was toxic. *See* R. 284-1 at 33–35, 114–15. More importantly, though, multiple witnesses, including Detective Hunter, Dr. Harries, and Dr. Arny himself, testified that Dr. Saxman examined every patient, while Dr. Arny did not. So Dr. Saxman's testimony as to this fact would have been cumulative. Therefore, Dr. Saxman's testimony would not have been harmful to Dr. Arny, so the decision not to interview or call her seems not to be based on a reasonable strategy.

Moreover, "[a] purportedly strategic decision is not objectively reasonable when the attorney has failed to investigate his options and make a reasonable choice between them." *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005) (quoting *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991)). Thus, counsel may not decline to interview a "known and important" witness without first "undertaking a full investigation into whether [the witness] could assist in the [defendant's] defense." *Id.* (internal citations omitted). Here, Dr. Saxman was known to previous counsel. *See* R. 405-1 at 3–8. And Dr. Arny explained to previous counsel why she was important: Dr. Arny followed Dr. Saxman's treatment plans, and yet she was still practicing medicine while he was facing criminal charges. Dr. Saxman also could have provided a legitimate medical reason for the treatment plans she created, which would have rebutted the government's expert testimony. Despite these powerful reasons for calling Dr. Saxman, previous counsel chose not to interview her without undertaking a full investigation into whether her testimony would help Dr. Arny. For example, there is no evidence that previous counsel compared Dr. Saxman's records to Dr. Arny's to determine if he just continued the treatment plans she established for each patient. Also, there is no evidence that previous counsel analyzed the records to determine how many of Dr. Arny's patients were

previously with Dr. Saxman. Without any such investigation, previous counsel had no way of knowing how helpful Dr. Saxman's testimony would be, so they could not make a strategic decision about whether to interview her. Therefore, previous counsel's decision not to interview Dr. Saxman was objectively unreasonable.

### c.   Previous counsel failed to investigate or interview Dr. Arny's patients

Dr. Arny argues that his counsel was ineffective for failing to investigate or interview his previous patients. The government called four of Dr. Arny's patients as witnesses against him, but previous counsel did not call a single patient, even after Dr. Arny emailed previous counsel asking them to call to the stand "patients [whom Dr. Arny] helped." R. 405-1 at 5. Previous counsel performed no investigation following this request from Dr. Arny, nor did previous counsel interview any of Dr. Arny's patients. After Dr. Arny moved for a new trial, the Court ordered Dr. Arny to provide evidence related to his patients. R. 433. He submitted six affidavits from previous patients whom he helped or whose testimony would be helpful to his case. *See* R. 434. As Dr. Arny points out, his new counsel found these patients in four business days, while previous counsel did not find a single one in two years. *Id.*

The question is whether defense counsel made an unreasonable decision when they neither investigated nor interviewed Dr. Arny's previous patients. Counsel has a duty to "investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Towns*, 395 F.3d at 258. Dr. Arny's patients who had legitimate pain could have testified that Dr. Arny examined them and prescribed them pain medication for a legitimate medical purpose. And given that the government needed to show that Dr. Arny did not have a "legitimate medical purpose" for prescribing medications, *see* R. 279 at 16, such testimony would have been highly relevant to Dr. Arny's guilt or innocence.

12

The record contains no evidence that the decision not to investigate or interview these patients was strategic; rather, it stems from neglect. *See United States v. Six*, 600 F. App'x 346, 351 (6th Cir. 2015) ("It is not the court's duty to second-guess [counsel's] strategic decisions but, instead, to decide whether they were in fact strategic decisions and not neglect."). In his affidavit, Mr. Owens stated that previous counsel reviewed some files and wanted to focus on the positive documents therein, so they chose not to review other files. R. 438-1. That statement may explain why counsel chose not to investigate other patient *files*, but it does not explain why counsel failed to interview some of Dr. Arny's previous patients to determine if any of them could offer testimony helpful to Dr. Arny. The government offers no explanation for why previous counsel chose not to investigate or interview any of Dr. Arny's patients. Without any evidence of a reasonable strategy, the decision not to investigate or interview patients seems unjustified.[4] *Towns*, 395 F.3d at 258 ("A purportedly strategic decision is not objectively reasonable when the attorney has failed to investigate his options and make a reasonable choice between them." (quoting *Horton*, 941 F.2d at 1462)).

The government responds that Dr. Arny agreed that testimony from his previous patients would not be helpful. R. 438 at 3. In support of this argument, the government points to an email from Dr. Arny to previous counsel in which he said: "In my opinion there is nothing special about [the 30 charts reviewed by the state] and if ANY other 30 charts were selected they would have said exactly the same thing." R. 438-2 (sent November 2012). Dr. Arny did admit that all of his charts were virtually the same, and he agreed that

---

[4] Though previous counsel did not have a duty to interview all of the patients Dr. Arny helped, they did have a duty to interview some of these patients to determine whether they had helpful information.

previous counsel should not investigate other patient files.  *Id.*  Nowhere in the email, though, did Dr. Arny agree that his patients should not testify, or that counsel should not interview patients he helped.  In fact, Dr. Arny stated in an email over a year later that he wanted them to call patients he helped.  R. 405-1 at 5 (sent January 2014).  Indeed, the whole point of patient testimony is to provide extra information not immediately apparent from medical files.  So Dr. Arny never agreed that his patients should not testify.  Thus, previous counsel's decision not to interview or investigate these patients was unreasonable.

## II.   *Strickland* Prejudice

To show constitutionally-ineffective assistance under *Strickland*, a defendant must also demonstrate that counsel's professionally unreasonable errors prejudiced his defense.  In other words, he must show that there is a reasonable probability that but for counsel's errors, the jury would have found reasonable doubt.  466 U.S. at 694; *see also Combs v. Coyle*, 205 F.3d 269, 290 (6th Cir. 2000).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*  A reasonable probability does not mean that it is more likely than not that the outcome would have been different.  *Id.* at 693.  When determining if there is a reasonable probability of a different outcome, the Court must weigh counsel's errors cumulatively against the evidence as a whole.  *Stewart v. Wolfenbarger*, 468 F.3d 338, 361 (6th Cir. 2006); *Mackey v. Russell*, 148 F. App'x 355, 368–69 (6th Cir. 2005) ("Here, the clear mandate of *Strickland* and several other Supreme Court cases is that the effect of all counsel's errors is to be considered in toto, against the backdrop of the totality of the evidence in the case."); *cf. Williams v. Taylor*, 529 U.S. 362, 398 (2000) ("[T]he State Supreme Court's prejudice determination was unreasonable insofar as it failed to evaluate the

totality of the available mitigation evidence . . . in reweighing it against the evidence in aggravation.").

Here, previous counsel lied to Dr. Arny and failed to interview Dr. Saxman. As a result, she never testified at trial. And because previous counsel failed to investigate or interview patients Dr. Arny helped, none of them testified either. Therefore, the question is whether there is a reasonable probability that the jury would have acquitted if Dr. Saxman and Dr. Arny's patients had testified.

### a.    Effect of the lie and the failure to interview Dr. Saxman

Dr. Saxman's testimony would have helped challenge a key element of the charge against Dr. Arny: whether he had a legitimate medical purpose for issuing the prescriptions. The government expert, Dr. Paul Harries, testified that: Dr. Arny was prescribing a "toxic" combination of medications to some patients; that this combination "tell[s] you the odds are that there is some kind of abuse going on here"; that there was no need to prescribe those medications; and that "[e]very patient was getting multiple controlled substances for no clear valid medical reason, with no treatment plan, no treatment goal." R. 284-1 at 17, 34–35, 40, 117. Thus, the government argued, Dr. Harries's testimony showed that Dr. Arny had no legitimate medical purpose for prescribing those medications.

According to Dr. Arny, however, he was just following Dr. Saxman's treatment plans when he prescribed these medications. And there is nothing to suggest that Dr. Saxman was involved in the conspiracy: she has not been indicted, her current office has not been searched, and, to the Court's knowledge, she has never even been told she was the target of an investigation. Imagine the power of Dr. Saxman's testimony. She could have testified that, although she created the treatment plans on which Dr. Arny relied, she continues to

practice medicine, and the government has not investigated, arrested, or charged her.  Any lay person hearing this would surely have serious questions about whether these combinations of medication were truly toxic.  Moreover, Dr. Saxman could have explained why she prescribed those combinations of pills to specific patients.  Her testimony, therefore, would have allowed defense counsel to argue that a reasonable doctor would have—and in fact, did—prescribe the combination of medications that Dr. Arny was prescribing.  So her testimony could have shown that there was a legitimate medical purpose for these prescriptions.

Dr. Saxman also would have counteracted the testimony of some of Dr. Arny's previous patients.  Josh Haney, for example, testified for the government that he kept seeing Dr. Arny because "[i]t fed a habit," not because he had a legitimate medical need for pain killers.  R. 305 at 193.  However, Haney also admitted that he received his first oxycodone prescription from Dr. Saxman.  *Id.* at 195.  Kimberly Preston testified that Dr. Saxman initially prescribed her Percocet 10s, and that Dr. Arny initially lowered her to Lortab but then continued the Percocet afterwards.  R. 305 at 210, 212, 214.  Rosa Sexton, another government witness, also testified that Dr. Arny just continued Dr. Saxman's course of treatment for her.  *Id.* at 237.  For each of these patients, Dr. Saxman could have explained why she prescribed pain killers to these patients.  Thus, her testimony could have provided a "legitimate medical purpose" for the distribution of controlled substances to each of these patients.

The government responds again that Dr. Saxman's testimony would actually have hurt Dr. Arny more than it helped.  However, as discussed above, Dr. Saxman's testimony would have been more helpful (to counteract the government's proof regarding "legitimate

medical purpose") than harmful (regarding Dr. Arny not seeing every patient, which was uncontested).  *Supra* Part I.b.  So this argument fails.

### b.    Effect of the failure to investigate or interview Dr. Arny's patients

### i.    Legitimate medical purpose

Dr. Arny's new counsel submitted affidavits from six patients whom he helped.[5]  Like Dr. Saxman's testimony, the testimony of these patients would have suggested that Dr. Arny's distribution of drugs was for a "legitimate medical purpose."  For example, James Bevins suffered from chronic pain beginning in 1984, when he cracked two vertebrae in a car accident.  R. 434-2 at 1.  Fourteen years later, Bevins threw his back out at work, which disabled him.  *Id.*  Bevins went to PAAH for medication to help with his pain.  Bevins stated that Dr. Arny provided him "with good medical care," and that Dr. Arny reduced his medications, which caused his pain to increase.  *Id.* at 1–2.  An examination of Bevins's records support his statements.  All of Bevins's charts note that Bevins experienced pain in his lower back, hips, and right leg.  R. 441-1 at 43, 46, 48, 50, 53, 57; R. 441-2 at 2, 4, 6, 9, 11, 13.  When Dr. Arny first saw Bevins, Dr. Arny prescribed Bevins 120 Percocet 10/650, and 30 Lorcet 10/650 to help his pain, R. 441-2 at 13,[6] which is what Dr. Saxman had prescribed for him.  *Id.* at 19.  However, in June 2011, Dr. Arny lowered Bevins's Percocet to 10/325.  R. 441-1 at 50.  In July 2011, Dr. Arny took Bevins off Lorcet completely.  *Id.* at

---

[5] The Court only gave Dr. Arny four business days to find and obtain affidavits from patients Dr. Arny helped.  In those four days, Dr. Arny's current counsel was able to get affidavits from six patients.  Given more time, current counsel will likely be able to find more patients to testify on Dr. Arny's behalf.

[6] Dr. Arny prescribed oxycodone in the form of Percocet.  Percocet is a mixture of oxycodone and acetaminophen (the main drug in Tylenol).  Dr. Arny prescribed hydrocodone in the form of Lorcet, which is a combination of hydrocodone and acetaminophen.  Acetaminophen enhances the pain-killing effects of oxycodone and hydrocodone.  The amount of acetaminophen in each drug is indicated by the second number describing the substance.  For example, Percocet 10/650 has 650 mg of acetaminophen, while Percocet 10/325 has 325 mg of acetaminophen.  So Percocet 10/325 has half as much acetaminophen as Percocet 10/650.

48.  The next month, though, Bevins told Dr. Arny he was experiencing increased pain due to this reduction, so Dr. Arny prescribed him Lorcet again.  *Id.* at 46.  These records, coupled with Bevins's testimony, suggest that Dr. Arny had a legitimate medical purpose for prescribing Bevins Percocet and Lorcet.  *See* R. 284-1 at 17–19 (deposition of Dr. Harries) (explaining that patient examinations and doctor's investigation into what medications are or are not helpful to a patient can demonstrate legitimate medical need for prescription).

### ii.  Usual course of medical practice

The testimony of Dr. Arny's patients would have also countered the government's evidence that Dr. Arny did not distribute drugs "in the usual course of medical practice."  Dr. Harries stated that Dr. Arny did not examine his patients every visit and that he did not have a relationship with his patients, suggesting that Dr. Arny acted outside the scope of ordinary medical practice.  *Id.* at 27–30, 40.  But the testimony of patient Jamie Adkins would have counteracted Dr. Harries's testimony.  In an affidavit, Adkins noted that "Dr. Arny was a good doctor and provided me with quality healthcare services," and that he "reduced [her] muscle relaxer and Xanax because [she] was getting too much."  R. 434-1 at 2.[7]  Adkins's medical records reveal that she was seen monthly from April 2011 through September 2011. R. 441 at 40–41, 57–66.  These records show Dr. Arny's interest in Adkins's health.  For example, in August 2011, he noted that she had gained significant weight since the previous month, and he indicated that her Xanax and Soma needed to be decreased as a result.  *Id.* at 59 (lowering Adkins's Xanax and Soma prescriptions from 100 pills to 60 pills, and decreasing her usage from one pill every 8 hours to one every 12 hours).  Adkins's testimony

---

[7] Adkins also stated that Dr. Arny switched her from "Lorcet to Norocot" because Norocot "had less Tylenol and would be less damaging to [her] liver." *Id.*  The government correctly points out that Dr. Acosta switched Adkins to Norocot, not Dr. Arny.  *See* R. 441 at 53.  However, Adkins's medical records still demonstrate that Dr. Arny examined Adkins on multiple visits and did lower her Xanax and Soma prescriptions when necessary.  *Id.* at 59.

would suggest that Dr. Arny cared about his patients' well-being, and that he did conduct regular examinations of some patients.

James Bevins's testimony would also have indicated that Dr. Arny cared about his patients and prescribed medication in the "usual course of medical practice."   As a preliminary matter, Bevins was examined monthly from September 2010 through September 2011.  R. 441-1 at 43, 46, 48, 50, 53, 57; R. 441-2 at 2, 4, 6, 9, 11, 13.  His records also show that Dr. Arny actively adjusted Bevins's medication as necessary.  *See id.* at 43, 46, 48, 50, 53.  Such adjustments arguably fell within the "usual course of medical practice," *see* R. 284-1 at 26–27, and suggest a valid doctor-patient relationship.  *See* R. 434-2 at 1 (affidavit of Bevins) ("From my experience, Dr. Arny provided me with good medical care."); *but see* R. 284-1 at 40 (deposition of Dr. Harries) (stating Dr. Arny did not have a valid doctor-patient relationship with his patients); R. 307 at 12 (closing argument of government) ("Was [Dr. Arny's prescription of controlled substances] outside the usual course of medical practice? Yes, it was.  It wasn't even a medical practice.  It was a pill mill.  Was there any doctor/patient relationship?  There's no evidence of that.  None.").  Moreover, Dr. Harries stated that Dr. Arny was prescribing a "near toxic" amount of Tylenol to his patients, which showed a "complete disregard for the well-being of the patients."  R. 284-1 at 114–15. However, Bevins's medical records demonstrate that Dr. Arny was worried about the amount of Tylenol he was prescribing.  Dr. Arny originally lowered Bevins's Percocet to 10/325 to decrease the level of acetaminophen (Tylenol) Bevins was taking.  R. 441-1 at 50.  Dr. Arny also took Bevins off Lorcet completely to decrease his Tylenol consumption.  *See id.* at 48. However, Bevins experienced increased pain as a result, so Dr. Arny had to put him back on Lorcet.  *Id.* at 46.  And the next month, Dr. Arny reduced Bevins's Lorcet to 10/325, noting

19

"chronic use of pain meds [with] Tylenol." *Id.* at 43.  Thus, Bevins's testimony and medical records would have shown that Dr. Arny (a) worried about the level of Tylenol his patients were using and (b) acted to lower the amount.

Patient Brian Blackburn's testimony would also have been helpful to show Dr. Arny's interest in his patients.  In his affidavit, Blackburn stated that "Dr. Arny told me don't take [the pills] if you don't need them for pain.  He also went over my medications.  He told me if I take too much it could hurt my liver.  Dr. [Arny] wanted to make sure I was taking my medications the right way."  R. 434-4 at 2.  These statements suggest that Dr. Arny properly warned patients of the risks associated with pain medication.  Blackburn's medical records support his affidavit.  For example, Dr. Arny decreased Blackburn's Lorcet to reduce his acetaminophen intake.  R. 441-5 at 49.  Dr. Arny and Blackburn also discussed the option of switching from Lorcet 10/650 to Percocet 7.5/325 to lower his acetaminophen intake.  *Id.*

The testimony and medical records of all three of the patients discussed above also would have contradicted the government's evidence that Dr. Arny's examinations were outside the usual course of medical practice.  At trial, the government introduced evidence that Dr. Arny only examined young, skinny female patients.  *See, e.g.*, R. 305 at 36 (testimony of Mr. Stapleton).  The government used this evidence to show that Dr. Arny's method for determining which patients to examine was not within usual course of medical practice.  *See* R. 284-1 at 21–23 (explaining that a doctor must examine patients to show a valid doctor-patient relationship).  None of the patients mentioned above fit the description of young and skinny females.  *See* R. 441 at 17, 68; R. 441-1; R. 441-5.  Also, the medical records reveal that these patients were seen monthly.  Finally, for all three of these patients, Dr. Arny adjusted their medication when necessary, whether to help with increased pain, to

20

reduce weight gain, or to decrease levels of Tylenol consumption.  Thus, these witnesses would suggest that Dr. Arny did not only examine or care about "young, skinny females."  R. 305 at 36.

### iii.    Testimony of patients the government called

Finally, Dr. Arny's patients would have challenged the testimony of the patients whom the government called.  The government's patient witnesses testified generally that Dr. Arny did not examine them, and that he just continued Dr. Saxman's course of treatment without asking any questions.  *See* R. 305 at 188–90, 210–15, 237, 242.  But these patients were confessed drug addicts who faced criminal charges for selling controlled substances. *See, e.g.*, *id.* at 200–02, 227–28, 253–54.  On the other hand, the patients presented by Dr. Arny were non-drug addicts with legitimate pain problems.  Had the jury heard testimony from these patients that Dr. Arny examined them, adjusted their medications when necessary, and provided them with good treatment, the jury might have believed them over the government's witnesses.

Indeed, the affidavits submitted by Dr. Arny's patients and their medical records paint a somewhat different picture than that of the government's witnesses.  Jamie Adkins stated that Dr. Arny initially prescribed her the same medication as her previous doctor, but then Dr. Arny reduced her medications.  R. 434-1 at 2; *see also* R. 441 at 59.  James Bevins stated that Dr. Arny noted in his chart that Bevins's pain was increasing due to his medication reduction.  R. 434-2 at 2.  Bevins's medical records show that Dr. Arny took Bevins off Lorcet, for example, due to Tylenol, but then re-prescribed it when Bevins's pain increased. R. 441-1 at 46, 48.  Brian Blackburn stated that Dr. Arny referred him to get tests done, which showed he had spinal stenosis and bulging disks.  R. 434-4 at 2.  Dr. Arny also

counseled him on not taking the various medications unless he needed them, *id.*, and adjusted Blackburn's medication to lower his Tylenol intake.  R. 441-5 at 49.  Annette Blair, another of Dr. Arny's patients, stated that Dr. Arny originally prescribed her one dosage, but then changed the dosage after he received her MRI.  R. 434-3 at 1.  She also asserted that the Lortab Dr. Arny prescribed was helpful in relieving her pain.  *Id.* at 2.  Finally, Doug Tackett stated in his affidavit that other doctors at the pain clinic overprescribed pain killers, but "Dr. Arny wasn't like those other doctors.  Dr. Arny was a good doctor.  He didn't overpr[e]scribe.  He really cared about my health. . . . Dr. Arny would reduce the number of Lorocet pills from 4 a day to 3 a day until he could run more tests. . . .  Dr. Arny would try to find out what the problem was.  Dr. Arny wouldn't write a prescription if he didn't think you needed it."  R. 434-6 at 1–2.  Taken together, these affidavits indicate that Dr. Arny was concerned for his patients' well-being, that he examined his patients, and that he did not just continue Dr. Saxman's treatment plan.

On the whole, these patients would have powerfully rebutted the government's evidence.  They would have provided the jury with personal accounts of how Dr. Arny helped them deal with their legitimate, chronic pain.  And their medical records would have shown that Dr. Arny did not just blindly follow Dr. Saxman's treatment plans; rather, he adjusted medications when necessary, and prevented his patients from taking too much acetaminophen.  Moreover, as discussed above, the record contains no evidence that these patients were drug addicts.  The jury could easily have found them more credible than the government's patient witnesses.  Overall, the testimony of these patients would have caused the jury to question whether Dr. Arny illegitimately prescribed pain medications or lacked valid doctor-patient relationships, even with the government's witnesses.

### c.    Cumulative prejudicial effect of these deficiencies

As stated above, the government needed to prove beyond a reasonable doubt that Dr. Arny did not distribute controlled substances "for a legitimate medical purpose" or "in the usual course of medical practice."  R. 279 at 16.  Through the testimony of Dr. Harries and Dr. Arny's previous patients, the government suggested that Dr. Arny acted unreasonably as a doctor and that there was no legitimate reason for him to be prescribing the medications he prescribed.

The testimony of Dr. Saxman and the patients Dr. Arny helped would have rebutted the government's evidence.  Dr. Saxman's testimony would have demonstrated that there was a "legitimate medical purpose" for the prescriptions Dr. Arny signed when he was following her treatment plan.  And the testimonies of the patients Dr. Arny helped (coupled with their medical records) would have suggested that Dr. Arny acted as a reasonable doctor—he did examine his patients, and he attempted to lower their medications when necessary.  It is true that many of Dr. Arny's charts reveal that Dr. Arny did not see his patients every visit, and that his examinations may have been incomplete when he did.  But these facts just show that Dr. Arny may have been a *bad pain doctor*; they are not themselves sufficient to prove that he was involved in the conspiracy.  *See id.* (instructing jury that "[y]ou may not convict the defendant merely because he acted negligently or failed to follow a rule or proper medical standards.").  And the medical records of Jamie Adkins, James Bevins, and Brian Blackburn reveal that they were examined on every visit, and that Dr. Arny reacted appropriately if these examinations showed any change in their conditions.  This evidence suggests that Dr. Arny prescribed pain medication "in the usual course of medical practice."  *See* R. 284-1 at 26–27.  The defense could have used the testimony of Dr.

Saxman and Dr. Arny's patients to argue that he distributed controlled substances "for a legitimate medical purpose" and "in the usual course of medical practice."  The jury might well have accepted that argument over the government's argument.  There is a reasonable probability that, but for previous counsel's errors, the jury would have had a reasonable doubt about Dr. Arny's guilt.  Therefore, previous counsel's errors prejudiced Dr. Arny under *Strickland*.  *See Combs*, 205 F.3d at 290.[8]

## III.    Remaining Errors

Dr. Arny asserts that previous counsel made five other errors that were unreasonable. One of these errors was previous counsel's failure to attend an important *Daubert* hearing.  A year before Dr. Arny's trial, counsel for the other three defendants filed *Daubert* motions to exclude Detective Hunter, a state police officer whom the United States was offering as an expert witness on pill mills.  R. 127; R. 133.  Previous counsel did not file a *Daubert* motion or join in his codefendants' motion.   On August 5, 2013, a hearing was held on the defendants' motions.  R. 159 (transcript of *Daubert* hearing).  Detective Hunter testified at the hearing and was cross-examined by counsel for the other three defendants.  But previous counsel was not present at the hearing.  R. 160 (minutes of *Daubert* hearing).  As a result, previous counsel did not hear Detective Hunter testify, and they were unable to cross-examine Detective Hunter.   Following the hearing, the Court limited Detective Hunter's opinion, stating it would be unduly prejudicial under Federal Rule of Evidence 403 for him to opine on whether PAAH exhibited the features of a pill mill, and whether any of the

---

[8] The Court does not come to this decision lightly.  Steve Owens and Kent Varney are two of the finest lawyers in Eastern Kentucky and have appeared before the Court on numerous occasions.  There are many occasions where Mr. Owens and Mr. Varney went above and beyond the call of duty in representing their clients.  This just happened not to be one of those occasions.

characteristics of PAAH were inconsistent with a legitimate medical practice.  R. 182 at 3–4 (*Daubert* order).

Dr. Arny claims that previous counsel's failure to attend the hearing was unreasonable.  Previous counsel did not have permission from the Court to miss the hearing.  R. 159 at 4–5.  Of course, that alone does not make their performance deficient under *Strickland*.  But when counsel fails to attend a hearing where a key witness will testify, they lose the opportunity to assess the witness's credibility, the witness's responses to questions, and the witness's demeanor.  None of these things can be gauged from a cold transcript.  Moreover, observing counsel for the other defendants question the witness can help counsel determine whether their own cross-examination strategy is sound.  Indeed, as most defense counsel know, the opportunity to question a government witness ahead of trial can help counsel assess the strengths and weaknesses of the government's case and of that particular witness.  Giving up this opportunity can ultimately harm the client, as it did here.

Despite the importance of the hearing, though, previous counsel's failure to attend the hearing is not unreasonable conduct under *Strickland*.  Since previous counsel did not file or join a *Daubert* motion to exclude Detective Hunter's testimony, counsel reasonably could have believed they did not need to attend the hearing.  *See id.* at 159 (noting previous counsel did not file a *Daubert* motion but could order a transcript of the proceedings).  And the purported strategy behind their decision made some sense: they did not want to give away the questions they ultimately wanted to use at trial.  *See Strickland*, 466 U.S. at 690 ("Because of the difficulties inherent in [evaluating counsel's conduct], a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the

circumstances, the challenged action might be considered sound trial strategy." (internal quotations omitted)).

Unfortunately, however, the damaging effect of not attending the hearing and assessing the strength of Detective Hunter's testimony became immediately apparent at trial. Detective Hunter was one of the government's best and most credible witnesses. Previous counsel would surely have noticed this if they had attended the hearing—the Court certainly did. In its *Daubert* order, the Court excluded as unduly prejudicial Detective Hunter's application of the facts in this case to the profile of a pill mill, stating that "there is a particularly acute risk the jury will convict [the defendant] simply because the defendant fits the profile" of a pill mill doctor. R. 182 at 13 (citing *United States v. Quigley*, 890 F.2d 1019, 1023–24 (8th Cir. 1989)). The Court reasoned that the jury could itself compare the facts of the case to the pill-mill profile, so "linking the traits of a typical pill mill to [PAAH] carries a significant risk of unfair prejudice." *Id.* However, when Detective Hunter testified at Dr. Arny's trial, previous counsel elicited the very testimony the Court excluded as prejudicial. R. 306 at 42–56; *see also* R. 182 (*Daubert* order).[9] Previous counsel did not ask any questions that directly asked for the excluded testimony. *See id.* However, Detective Hunter's answers included testimony that the Court excluded in its *Daubert* order, and previous counsel did nothing to control Detective Hunter. Previous counsel did not move to strike. He did not point to the Court's order and ask for a limiting instruction. Rather, he proceeded as if nothing was going wrong. As a result, previous counsel allowed Detective

---

[9] Dr. Arny also argues that previous counsel's failure to enforce the *Daubert* order during cross examination was its own error under *Strickland*. However, cross examinations "fall[] within the area of trial tactics and strategy that should not be subjected to second guessing and hindsight by this Court." *United States v. Steele*, 727 F.2d 580, 591 (6th Cir. 1984). So this error was not unreasonable. As such, the Court only considers this error as an effect of previous counsel's failure to attend the *Daubert* hearing.

Hunter to testify that it is "typical" of pill mills that Dr. Arny removed patients from PAAH because "[t]hey're trying to put on the air of a legitimate medical facility." *Id.* at 53; *see also id.* at 42, 54. Detective Hunter also stated that Dr. Arny's use of MRIs and x-rays was consistent with pill-mill physicians because they use such tests to generate cash. *Id.* at 42. Finally, in response to previous counsel's question about Dr. Arny lowering prescription levels, Detective Hunter stated that pill-mill physicians commonly decrease a patient's medication. *Id.* at 43. All three of these statements applied the profile of a pill mill to PAAH and the profile of a pill-mill doctor to Dr. Arny. Thus, the jury could have convicted Dr. Arny solely based on Detective Hunter's application of pill-mill profiles to the facts. *See* R. 182 at 13.

Because the decision not to attend the *Daubert* hearing was reasonable under *Strickland*, the fact that this decision might also have prejudiced Dr. Arny through Detective Hunter's testimony has no effect on the Court's decision today. Under some lesser standard of ineffective assistance of counsel under Rule 33, the failure to attend the *Daubert* hearing might be an error the Court could consider. *See Munoz*, 605 F.3d at 373–76 (considering whether Rule 33 may permit a court to grant a new trial under Rule 33 for ineffective assistance of counsel under a lesser standard than *Strickland*). However, because three of previous counsel's errors satisfy the *Strickland* standard, the Court need not answer the difficult questions of whether Rule 33 allows for a new trial under some lesser standard than *Strickland*; if so, what this standard should be; and whether their failure to attend the *Daubert* hearing meets that standard.[10]

---

[10] Dr. Arny asserts that previous counsel made three more errors that were deficient under *Strickland* when they (a) failed to file any motions in *limine*, (b) failed to file a motion to suppress Dr. Arny's statement, and (c) failed to

## CONCLUSION

In the end, previous counsel's representation of Dr. Arny was constitutionally deficient under *Strickland*.  Accordingly, it is **ORDERED** that Dr. Arny's motion for a new trial, R. 336, is **GRANTED**.

A separate opinion will issue on the defendant's motion for leave to file, R. 335.

This the 28th day of September, 2015.

Signed By:

*Amul R. Thapar*

United States District Judge

---

address the elements of the crime in closing argument.  Because the three errors discussed *supra* Part I are sufficient to meet *Strickland*, the Court need not address the remaining errors.